Gants, Ralph D., J.
The Attorney General of the Commonwealth of Massachusetts (“the Attorney General” or “the Commonwealth”) has brought this action alleging that the defendants Option One Mortgage Corp. (“Option One”) and H&R Block Mortgage Corp. (“H&R Mortgage”), through their issuance of subprime loans to Massachusetts borrowers, violated G.L.c. 93A by engaging in unfair and deceptive acts and practices, and G.L.c. 15IB, §4(3B) by discriminating against black and Latino borrowers. The Commonwealth also alleges that the corporate parents and grandparents of Option One and H&R Mortgage — the defendants Block Financial Corp. (“Block Financial”) and H&R Block, Inc. (“H&R Block”) — participated in the wrongdoing committed by their wholly-owned subsidiaries. Since AH Mortgage Acquisition Co., doing business as American Home Mortgage Servicing, Inc. (“American Home”), on April 30,2008 acquired the servicing rights to the entirety of the loan portfolio of Option One and H&R Mortgage, the Commonwealth has also sued American Home, against whom it alleges no wrongdoing, in order to accomplish the injunctive relief it seeks.
The Commonwealth has moved for a preliminary injunction seeking, among other relief, to prevent American Home from proceeding to foreclosure on any property secured by a Massachusetts loan issued by Option One or H&R Mortgage without first giving the Attorney General a 90-day period to examine the documentation on the loan and, if the Attorney General were to object to the foreclosure, without the approval of the Court. The defendants vigorously oppose the preliminary injunction and have each separately moved to dismiss on various grounds. This Court on October 24, 2008 heard argument as to all the motions to dismiss and as to the preliminary injunction, and shall rule upon them together in this consolidated memorandum.
Background
As all counsel in this case well know, this is not the first case in which this Court has confronted allegations of unfair and deceptive conduct by a sub-prime lender. On February 25, 2008, this Court issued a preliminary injunction against subprime lender Fremont Investment & Loan (“Fremont”) based on the Court’s preliminary finding that Fremont had issued some sub-prime loans to borrowers whom Fremont reasonably should have recognized:
1. would not be able to meet the scheduled payments once the low introductory rate, known colloquially as the “teaser” rate, expired at the close of the introductory period; and
2. would not be able to refinance the loan at or around the close of the introductory period if housing prices declined.
Commonwealth v. Fremont Inv. & Loan, 2008 WL 517279 (Mass.Super. 2008) (Mass. Super. 2008) (“the Fremont Decision”) [23 Mass. L. Rptr. 567, amended by 24 Mass. L. Rptr. 12 (Gants, Ralph D., J.]. In the Fremont Decision, this Court held:
Given the fluctuations in the housing market and the inherent uncertainties as to how that market will fluctuate over time, this Court finds that it is unfair for a lender to issue a home mortgage loan secured by the borrower’s principal dwelling that the lender reasonably expects will fall into default once the introductory period ends unless the fair market value of the home has increased at the close of the introductory period. To issue a home mortgage loan whose success relies on the hope that the fair market value of the home will increase during the introductory period is as unfair as issuing a home mortgage loan whose success depends on the hope that the borrower’s income will increase during that same period.
Id. at * 10. To give practical meaning to this preliminary finding, this Court ruled that any mortgage loan secured by the borrower’s principal dwelling should be presumed to be structurally unfair if the loan possesses four characteristics:
1. The loan is an adjustable rate mortgage, known in the lending industry as an “ARM,” with an introductory period of three years or less;
2. The loan has an introductory or “teaser” rate for the initial period that is at least 3 percent lower than the fully indexed rate;[1]
*94 3. The borrower has a debt-to-income ratio (“DTI”) that would have exceeded 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the introductory rate, but by the debt due under the fully indexed rate;
4. The loan-to-value ratio (“LTV”) is 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.
Id. at *11. This Court noted, “The effect of the presumption is to shift the burden of production to the lender to demonstrate that the loan was not actually unfair, perhaps by showing that the borrower had other assets that realistically could have enabled the borrower to meet the scheduled payments and avoid foreclosure, or other reasonable means of obtaining refinancing even if the fair market price of the mortgaged home had fallen. This presumption would not change the burden of proving a Chapter 93A violation; the burden of proving that the loan was unfair remains with the plaintiff borrower.” Id.
The defendants in this action have essentially pursued a three-tiered strategy in this litigation. First, they have directly confronted this Court’s preliminary finding by contending that Chapter 93A’s prohibition of unfair conduct is void for vagueness as applied by the Court. Second, they have raised other arguments notyet raised by Fremont. Third, they have contended, in essence, that their underwriting was more reasoned than Fremont’s and that, since American Home is now servicing these loans, a preliminary injunction is neither necessary nor appropriate.
Since the Commonwealth’s motion for preliminary injunction inevitably must fail against a defendant if the defendant’s motion to dismiss were to be allowed, this Court will first consider the motions to dismiss. Since the motion to dismiss brought by Option One and H&R Mortgage to dismiss for failure to state a claim goes to the heart of this Court’s reasoning in the Fremont Decision, this Court will first address that motion to dismiss.
Option One’s and H&R Mortgage’s Motion to Dismiss for Failure to State a Claim
Option One and H&R Mortgage contend that the Commonwealth’s Complaint fails to state a claim against them on various grounds, which this Court will consider in turn.
1. Is Chapter 93A Unconstitutionally Void for Vagueness as Applied?
G.L.c. 93A, §2(a) makes unlawful any “[ujnfair or deceptive acts or practices in the conduct of any trade or commerce.” G.L.c. 93A, §2(a). Option One and H&R Mortgage contend that the Commonwealth’s interpretation of unfairness under Chapter 93A, if adopted by the Court, would render the statute unconstitutionally void for vagueness because it would not give lenders fair notice of the conduct that is prohibited, would engender the possibility of arbitrary and discriminatory enforcement, and would “defeat the intrinsic promise of, and frustrate the essence of, a constitutional regime.” City of Mesquite v. Aladdin’s Castle, Inc., 455 U.S. 283, 290 (1982).
The Supreme Judicial Court has made clear that Chapter 93A was intended to be far more than a pale reflection of existing statutory and common-law rights. As the Court has declared:
Chapter 93A is “a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights.” Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). The relief available under c. 93A is “sui generis. It is neither wholly tortious nor wholly contractual in nature, and is not subject to the traditional limitations of preexisting causes of action.” Id. at 704. It “mak[es] conduct unlawful which was not unlawful under the common law or any prior statute.” Commonwealth v. DeCotis, 366 Mass. 234, 244 n.8 (1974). Thus, a cause of action under c. 93A is “not dependent on traditional tort or contract law concepts for its definition.” Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 626 (1978). See Nei v. Burley, 388 Mass. 307, 313 (1983) (“(A)nalogies between common law claims for breach of contract, fraud, or deceit and claims under c. 93A are inappropriate because c. 93A dispenses with the need to prove many of the essential elements of those common law claims”).
Kattar v. Demoulas, 433 Mass. 1, 12-13 (2000). While recognizing that the interpretation of Chapter 93A may be expansive to accomplish its legislative purpose, the Supreme Judicial Court has also made clear that the interpretation of unfairness under Chapter 93A should be limited in its scope. The Court has set forth three considerations to be used in determining whether an act or practice is unfair:
(1) “whether the practice ... is within at least the penumbra of some common-law, statutory, or other established concept of unfairness”;
(2) whether it “is immoral, unethical, oppressive, or unscrupulous”; and
(3) whether it “causes substantial injury” to consumers (or competitors or other businessmen).
Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975), quoting 29 Fed.Reg. 8325, 8355 (1964). Each of these three considerations essentially ensure that the defendant corporation had fair notice that the conduct in question was unfair, even though it may not have had specific warning that the particular conduct was expressly prohibited. If a court respects these three considerations in its interpretation of unfairness under Chapter 93A, it effectively obviates any reasonable contention that the interpretation renders Chap *95 ter 93A unconstitutionally void for vagueness as applied. See generally Village of Hoffman Estates v. Flipside, 455 U.S. 489, 503 (1982) (“principal inquiry is whether the law affords fair warning of what is proscribed”).
The gist of Option One’s and H&R Mortgage’s void for vagueness argument is that they did not have fair notice that the conduct proscribed by this Court in its Fremont Decision could be deemed unfair until November 15, 2007, when the Attorney General’s regulatory amendments specifically identifying particular mortgage lending practices as unfair took effect. 940 CMR 8.01 et seq. This Court disagrees. While this Court characterized as “structurally unfair” those mortgage loans that the borrower would likely be unable to repay and unable to refinance once the introductory period ended, it would perhaps have been more accurate to characterize the prohibited unfair conduct as the issuance of home mortgage loans with reckless disregard of the risk of foreclosure. Option One and H&R Mortgage cannot credibly contend that they did not have fair notice that it was unfair to issue home mortgage loans in Massachusetts with reckless disregard of the risk of foreclosure.
In 1997, the Massachusetts Commissioner of Banks published an advisory sent to each executive officer of each state-chartered financial institution and each licensed mortgage lender in Massachusetts concerning what he described as the “growing practice” of subprime lending. Division of Banks, Subprime Lending (December 10, 1997) at 1. The Commissioner expressly distinguished between subprime lending and predatory lending. He defined “predatory mortgage lending” as “extending ‘credit to a consumer based on the consumer’s collateral if, considering the consumer’s current and expected income, . . . the consumer will be unable to make the scheduled payments to repay the obligation.’ ” Id., quoting 209 CMR 32.32(5)(a) (1996). This definition of predatory lending was not limited to loans carrying unusually high interest rates; it was focused solely on the recklessness of the underwriting. The Commissioner expressly observed that predatory lending, as he defined it, could destabilize low-and moderate-income neighborhoods, and was “a prohibited illegal act [that] will not be tolerated by the Division [of Banks].” Id. See also id. at 2 (“predatory lending is an illegal credit practice”). Indeed, he noted that policies that ignore the suitability of a subprime loan for certain consumers may be considered “unfair and deceptive” even if the lender complies with other consumer protection laws and regulations. Id. at 2.
The Commissioner of Banks was not alone in characterizing as “predatory lending” the issuance of home mortgage loans with reckless disregard of the risk of foreclosure; the United States Office of the Comptroller of the Currency joined in that characterization. An Office of the Comptroller of the Currency Advisory Letter (AL 2003-2), issued by the Deputy Comptroller for Compliance, dated February 21, 2003 wrote:
The terms “abusive lending” or “predatory lending” are most frequently defined by reference to a variety of lending practices. Although it is generally necessary to consider the totality of the circumstances to assess whether a loan is predatory, a fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered.
AL 2003-2 at 2.
This characterization of reckless disregard of the risk of foreclosure in the issuance of a loan as “predatory lending” was effectively adopted by the Massachusetts Legislature when it enacted the Predatory Home Loan Practices Act on August 9, 2004, which prohibited lenders from making a “high cost mortgage loan” “unless the lender reasonably believes at the time the loan is consummated that 1 or more of the obligors will be able to make the scheduled payments to repay the home loan based upon a consideration of the obligor’s current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower’s equity in the dwelling which secures repayment of the loan.” G.L.c. 183C, §4. The Act provided lenders with a safe harbor in making a reasonable determination regarding the borrower’s ability to repay — if the borrower’s debt-to-income ratio was 50 percent or less, the borrower was presumed able to make the scheduled payments. Id. See also 209 CMR 32.34(c) (same). To be sure, since only “high cost mortgage loans” were within the Predatory Home Loan Practices Act, there were predatory home loans that fell outside the scope of the Act, but that did not make them any less predatory under the broader definition employed by the Commissioner of Banks and the Office of the Comptroller of the Currency.
The United States Congress also effectively recognized that reckless disregard of the risk of foreclosure in the issuance of a loan is predatory lending when, well before Option One or H&R Mortgage issued any of the subprime loans at issue in this litigation, it enacted the Home Ownership and Equity Protection Act, which declared, “A creditor shall not engage in a pattern or practice of extending credit to consumers under mortgages . . . based on the consumers’ collateral without regard to the consumers’ repayment ability, including the consumers’ current and expected income, current obligations, and employment.” 15 U.S.C. § 1639(h). The Comptroller of the Currency relied on this statute in enacting in 2003 its regulation that expressly prohibited national banks from making a loan secured by a mortgage on real estate “based predominantly on the bank’s realization of the foreclosure or liquidation value of the borrower’s collateral, *96 without regard to the borrower’s ability to repay the loan according to its terms.” 12 C.F.R. §34.3.
When one considers the warning against predatory lending in the advisory letters issued by the Commissioner of Banks and the Office of the Comptroller of the Currency with the statutory proscriptions against predatory lending in the Massachusetts Predatory Home Loan Practices Act and the federal Home Ownership and Equity Protection Act, it is plain that the practice of issuing a loan with reckless disregard of the risk of foreclosure was “within at least the penumbra of some common-law, statutory, or other established concept of unfairness.” See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. at 778.
Moreover, when one recognizes that the issuance of a loan that is structurally unfair means that the lender issued the home mortgage loan with reckless disregard of the risk of foreclosure, it becomes equally plain that this practice also meets the second and third factors that the Supreme Judicial Court said should be considered in determining whether a practice was “unfair” under Chapter 93A — "whether it is immoral, unethical, oppressive, or unscrupulous"; and whether it causes “substantial injuiy” to consumers (or competitors or other businessmen). See id. Anyone with any understanding of home foreclosure recognizes how much injury it causes to the families who resided in foreclosed homes. Consequently, any lender with even a modicum of business moralily should recognize that it is immoral, unethical, and unscrupulous to issue a home loan with reckless disregard of the risk of foreclosure. Indeed, I doubt that any lender would admit that it acted with such reckless disregard, because it defies the very essence of loan underwriting, which seeks reasonably to evaluate the risk of foreclosure. Therefore, no lender in good conscience can claim, in the words of Captain Renault in the movie, Casablanca, that it was “shocked, shocked” to learn that it was unfair to issue home loans with reckless disregard of the risk of foreclosure. Since there was abundant fair warning from the advisory letters issued by the Commissioner of Banks and the Office of the Comptroller of the Currency, from the prohibitions in the Massachusetts Predatory Home Loan Practices Act and the federal Home Ownership and Equity Protection Act, from the ethical bar against recklessness in underwriting, and from the substantial injury posed by such reckless lending, Chapter 93A is not void for vagueness if the issuance of a home loan with reckless disregard of the risk of foreclosure is deemed “unfair” under G.L.c. 93A, §2.
Unable to show that it did not have fair warning that it was unfair to issue home loans with reckless disregard of the risk of foreclosure, Option One and H&R Mortgage instead contend that the Attorney General’s Complaint seeks to declare loans unfair simply because they were adjustable rate mortgage loans with low “teaser” rates, or because the borrower had a high debt-to-income ratio, or because the loan had a high loan-to-value ratio, or because the loan had a prepayment penalty. The Complaint, however, does not allege that a loan possessing any of these characteristics is per se unfair; nor did this Court so rule in its Fremont Decision. Rather, the Complaint, reasonably construed, alleges that these features, when combined, may under certain circumstances make a loan unfair.
This Court in its Fremont Decision, as earlier noted, identified four characteristics that, when combined, were sufficient to shift the burden of production to the lender to demonstrate that the loan was not actually unfair. Option One and H&R Block contend that, until the Fremont Decision, it did not have fair notice that these characteristics could make a loan unfair. The fact of the matter is that, as this Court has just found, mortgage lenders had fair notice that it was unfair to issue loans with reckless disregard of the risk of foreclosure, and they would have had fair notice that these four characteristics would be considered in the determination of reckless disregard if they simply did the math. It takes nothing more than math to recognize that, if a lender issues an adjustable rate mortgage with an introductoiy period of three years or less in which the introductory or “teaser” rate for the initial period is at least three percent lower than the fully indexed rate, the borrower will suffer significant “payment shock” at the end of the introductoiy period unless the LIBOR has significantly dropped. When the borrower already has a debt-to-income ratio greater than 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the “teaser” rate, but by the debt due under the fully indexed rate, the borrower, without, other resources, will likely not be able to afford the mortgage payments once the payment shock kicks in.[2] The borrower will likely need to refinance in order to avoid foreclosure but will likely be unable to unless housing prices have increased if the loan-to-value ratio already is 100 percent or if the loan carries a substantial prepayment penally or if the loan has a prepayment penalty that extends beyond the introductoiy period. Consequently, these factors, considered collectively, strongly suggest that the lender acted in reckless disregard of the risk of foreclosure because, absent other circumstances, the borrower will not likely be able to afford the loan after the “teaser” rate expires but will only be able to refinance if housing prices were to rise. To be sure, these factors simply suggest reckless disregard; they do not require such a finding, especially if the lender introduces other evidence demonstrating that its issuance of the loan was reasoned, for instance, because of the availability or expectation of other assets.
For all these reasons, Option One’s and H&R Mortgage’s motion to dismiss the Complaint because the Complaint’s interpretation of unfairness under Chapter 93A is void for vagueness is denied.
*97 2.Does the Relief Sought Under the Complaint Violate the Contracts Clause of the United States Constitution?
Option One and H&R Mortgage next contend that any interference with the enforcement of their mortgage loans on the grounds that they were unfair under Chapter 93A would violate the Contracts Clause of the United States Constitution, which provides that “[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts.” U.S. Const. Art. I, §10, cl. 1. This Court need not dwell long on this argument.
“That constitutional provision aims ‘at the legislative power of the State, and not at decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals.’ ” Municipal Light Co. of Ashburnham v. Commonwealth, 34 Mass.App.Ct. 162, 171 (1993), quoting New Orleans Waterworks Co. v. Louisiana Sugar Refining Co., 125 U.S. 18, 30 (1888). Consequently, Option One and H&R Mortgage must essentially contend that the Massachusetts Legislature violated the Contracts Clause by prohibiting unfairness in transactions in trade or commerce under Chapter 93A. Assuming for the moment that the in-junctive relief sought by the Commonwealth may result in foreclosures being temporarily delayed on loans deemed unfair and in loan terms being modified to eliminate the unfairness, and assuming that this would be deemed a substantial impairment of those loan agreements, an impairment may still be constitutional “if it is reasonable and necessary to serve an important public purpose.” Massachusetts Community College Council v. Commonwealth, 420 Mass. 126, 132-33 (1995), quoting United States Trust Co. v. New Jersey, 431 U.S. 1, 25 (1977). The regulation of unfair transactions in trade and commerce is plainly reasonable and necessary to serve an important public purpose, especially when any “impairment” must be predicated on a judicial finding of unfairness or deception. Indeed, this Court cannot imagine that any court would find that the consumer protections provided by Chapter 93A are unconstitutional because they impair contracts found to be unfair or deceptive. Therefore, Option One’s and H&R Mortgage’s motion to dismiss the Complaint because the Complaint’s claims are premised on a statute that unconstitutionally impairs contracts is denied.
3.Does the Commonwealth’s Chapter 93A Claim Violate the Dormant Commerce Clause?
The Commerce Clause provides that “Congress shall have Power ... to regulate Commerce . .. among the several states . . .” U.S. Const. Art. I, §8, cl. 3. The United States Supreme Court has interpreted this express grant of power to the Congress as implicitly restraining the authority of each state to regulate interstate commerce. See United Haulers Ass’n, Inc. v. Oneida-Herkimer Solid Waste Mgm’t Authority, 127 S.Ct. 1786, 1792 (2007).
For all practical purposes, what has become known as the Dormant Commerce Clause imposes two restraints on state regulation of interstate commerce. First, a state may not regulate commerce that occurs wholly outside of its borders. See Healy v. Beer Institute, 491 U.S. 324, 336 (1989). Here, this action is focused solely on loans issued to Massachusetts borrowers, which are transactions that Massachusetts is plainly entitled to regulate. Second, a state may not, through its regulation of commerce, discriminate against interstate commerce in favor of intrastate commerce, either on its face or in its effect. See Department of Revenue of Ky. v. Davis, 128 S.Ct. 1801, 1808 (2008); Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). Here, neither Chapter 93A nor the relief sought in this action in any way favors Massachusetts lenders over lenders from other states; it simply seeks protection for Massachusetts borrowers from unfair or deceptive loans. Nor does either Chapter 93A or the relief sought in this action discriminate between instate and out-of-state lenders; the focus is on the terms of the loans and the manner in which they were issued, not on the location of the lenders’ corporate headquarters. “Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.” Pike v. Bruce Church, Inc., 397 U.S. at 142. Under this standard, the Dormant Commerce Clause plainly cannot bar this Chapter 93A action. Indeed, if it did, that interpretation would effectively negate virtually all the consumer protection intended to be provided under Chapter 93A in the name of protecting interstate commerce.
Option One’s and H&R Mortgage’s motion to dismiss the Complaint because the relief it seeks would violate the Dormant Commerce Clause is denied.
4.Are the Claims in the Complaint Preempted by the Federal Depository Institutions Deregulation and Monetary Control Act?
Under the federal Depository Institutions Deregulation and Monetary Control Act (“DIDMCA”), “(t]he provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged . . . shall not apply to any loan [or] mortgage, . . . which is secured by a first lien on residential real property . . . made after March 31, 1980 . . .” 12 U.S.C. §1735f-7a(a)(1). DIDMCA was enacted by Congress early in 1980, when interest rates were at historic highs in the last year of the Carter Administration, in order to alleviate the mortgage credit crunch caused by state usury laws that were below the market rate of interest. See Senate Report No. 96-368 (Oct. 15, 1979). DIDMCA, however, expressly permitted states to opt out of DIDMCA by passing a statute “which states explicitly and by its *98 terms that such State does not want the provisions of subsection (a)(1) of this section to apply with respect to loans [and] mortgages . . . made in such State.” 12 U.S.C. §1735f-7a(b)(2).
Option One and H&R Mortgage argue that DIDMCA preempts the Massachusetts Usuiy Statute, G.L.c. 271, §49, and the Predatory Home Loan Practices Act, G.L.c. 183C, and seeks the dismissal of the Chapter 93A claim in the Complaint to the extent that it rests on these statutes. Their argument is perplexing for at least two reasons. First, the Massachusetts Legislature exercised its authority under DIDMCA to opt out, enacting a statute that reads in pertinent part, “The commonwealth of Massachusetts hereby declares and explicitly states by the terms of this act that it does not want any of the provisions of [12 U.S.C. §1735f-7a(a)(l)] to apply with respect to loans, mortgages, credit sales and advances made in this commonwealth . . .” 1981 Mass. Acts, c. 231. Consequently, the provisions of 12 U.S.C. §1735f-7a(a)(l) do not apply in this Commonwealth. Second, while the Chapter 93A allegations in the Attorney General’s Complaint include allegations that some of the loans issued by these defendants violate the Usury Act and the Predatory Home Loan Practices Act, her Chapter 93A claim would survive without these allegations. This is not a case where the Chapter 93A allegations rest on a finding of a violation of either the Usury Act or the Predatory Home Loan Practices Act. Consequently, Option One’s and H&R Mortgage’s motion to dismiss the Chapter 93A claim in the Complaint because the Complaint’s allegations are preempted by DIDMCA must be denied.
5. Must all Claims Based on the Issuance of “Stated Income” or “No Documentation” Loans be Dismissed?
In this Court’s Fremont Decision, this Court declined to find that loans in which the lender’s underwriters relied solely on the stated income of the borrower and required no documentation (referred to as “stated income” or “no documentation” loans) were, on that basis alone, presumptively unfair, even though the evidence in that case indicated that such loans were far more prone to foreclosure. This Court explained:
The reason is that “stated income” loans are no more prone to foreclosure than full documentation loans if the statements in the application are accurate; they become more prone to foreclosure only if the applicant (or the broker with the acquiescence or ignorance of the applicant) falsely inflates his income or assets. While such loans may not be prudent for a bank to issue because they fail to protect the bank from the risk of fraud, they cannot be said to be unfair to the borrower for this reason. In other words, a borrower may not fairly complain that a bank was unfair to him by giving him an opportunity to lie on his loan application without any meaningful risk of getting caught.
Fremont Decision at * 11. Option One and H&R Mortgage seek to stretch this finding to require the dismissal of any claim based on the issuance of “stated income” or “no documentation” loans. This is a stretch too far, especially when viewed in the context of the entire Fremont Decision.
While Option One and H&R Mortgage are correct that, standing alone, the issuance of a “stated income” or “no documentation” loan was not found in the Fremont Decision to be an unfair act under Chapter 93A, that does not mean that the fact that a loan is a “stated income” or “no documentation” loan is irrelevant to the determination of whether the loan was unfair. In its Fremont Decision, this Court made preliminary findings of fact that:
[T]he Attorney General submitted eight affidavits from lenders facing foreclosure. In six of these applications, the borrower’s stated income was substantially inflated on the loan application. In each of these six false loan applications, this Court finds that the mortgage broker either prepared the loan application and inflated the income without the borrower’s knowledge or permission (even though each borrower signed the loan application under the pains and penalties of perjury) or acted in complicity with the borrower in misrepresenting the borrower’s income in order for the borrower to qualify for the loan. There is no evidence that Fremont knew of these misrepresentations. Nor is there any evidence that Fremont willfully blinded itself to the fact that some of the mortgage brokers who brought loans to it were knowingly inflating the borrower’s income. Nor does this Court find, based on this record, that Fremont recklessly supervised its brokers by continuing to do business with them after Fremont learned that the brokers had a pattern or practice of inflating the borrower’s income on the loan applications they had submitted. In short, with respect to the falsified loan applications, the evidence in the record reflects that Fremont was a victim of these misrepresentations and did not encourage or tolerate them.
Fremont Decision at *7. Through these findings, this Court indicated that the issuance of “stated income” or “no documentation” loans may be an unfair or deceptive act if the lender used this vehicle to issue loans based on loan applications that it knew or should have known were false, and thereby in some fashion encouraged or tolerated the borrower’s false representations. Since the Attorney General’s Complaint alleges that Option One and H&R Mortgage issued “stated income” or “no documentation” loans while it solicited, encouraged, or invited borrowers to submit false information in loan applications, its allegations regarding “stated income” or “no documentation” loans, which must be accepted as true for *99 purposes of a motion to dismiss, are sufficient to survive a motion to dismiss.
6. Must the Discrimination Claim under G.L.c. 15 IB be Dismissed?
Under G.L.c. 151B, §4(3B), it is an unlawful practice “[f]or any person whose business includes granting mortgage loans ... to discriminate against any person in the granting of any mortgage loan or in making available such a transaction, or in the terms or conditions of such a loan or transaction, because of race, color, . . . [or] national origin . . .” G.L.c. 151B, §4(3B). In her Complaint (although not in her motion for preliminary injunction), the Attorney General alleges that Option One and H&R Mortgage had a Pricing Policy that was based, in part, on subjective factors under which black and Latino borrowers were charged higher points and fees than similarly-situated non-mi-noriiy borrowers for loans in Massachusetts, even when objective factors other than race and national origin were equal. See Complaint at pp. 36-41. Option One and H&R Mortgage challenge the discrimination claim on two grounds.
First, they argue that the discrimination claim must be dismissed to the extent it is based on loans originated one year before the Complaint was filed (that is, before June 3, 2007), because a civil action claiming a violation “relative to housing” under G.L.c. 151B “shall not be commenced later than one year after the alleged unlawful practice has occurred.” G.L.c. 151B, §9. They contend that the discrimination claim effectively alleges on behalf of individual black and Latino borrowers that each individual borrower was discriminated against in the terms of his or her loan, and that the act of discrimination therefore occurred on the date the borrower entered into the loan.
The Supreme Judicial Court in Ocean Spray Cranberries, Inc. v. Mass. Comm’n Against Discrimination set forth how the limitations period should be determined for serial acts of discrimination in the context of determining the limitations period for a claim under G.L.c. 151 of handicap discrimination based on the failure to provide a reasonable accommodation. 441 Mass. 632 (2004). There, the Court found that the limitations period commenced when the employer refused to provide the requested accommodation. Id. at 644. The Court expressly rejected what it characterized as the “each day” theory, which would have made each day the plaintiff continued to be denied a reasonable accommodation a continuing violation that started the limitations clock anew. Id. at 643-45. The Court found that allowing an “each day” theoiy “would eviscerate the purpose of a statutory limitations period, and permit what should be a limited exception to such a stricture [referring to the continuing violation exception] to swallow it whole.” Id. at 645.
However, the Court in Ocean Spray Cranberries, Inc. also recognized the possibility that the employee may not immediately know whether she has been a victim of handicap discrimination. The Court declared:
There remains, however, a practical problem that must be addressed regarding the precise moment when the statute begins to run. While an explicit refusal by an employer to accommodate (or to engage at all in the interactive process) presents the easy case, the harder case is presented when the employer takes equivocal action or, as the commissioner found occurred here, simply takes no action at all. In such circumstances, employees cannot be expected to come forward with a claim of discrimination until they are able to appreciate that the requests will not be accommodated, and an act of discrimination has occurred. Consequently, the employee must be allowed some time after making a request for an accommodation to await action from the employer and to assess whether such action has been adequately forthcoming. That time period cannot go on indefinitely, or it would render the limitations period wholly ineffectual as well. We conclude that, when an employer responds to a request for a reasonable accommodation with equivocal action or inaction, the limitations period in G.L.c. 15IB, §5, begins to run at the point thereafter when the employee knew or reasonably should have been aware that the employer was unlikely to afford him a reasonable accommodation. This formulation is similar in substance to the third requirement of the continuing violation rule . . . : which is, whether the employer’s actions (or inactions) were sufficient either to make the complainant aware of the discrimination, or to enable him to form a reasonable belief thereof. It is also consistent with the rule we apply in tort cases concerning when the statutorily provided three-year limitations period begins to run.
Id. at 645-46 (footnote omitted). The Court, no doubt respecting that part of G.L.c. 15 IB, §9 which provides, “This chapter shall be construed liberally for the accomplishment of its purposes,” was not prepared to interpret the limitations period in §9 so that a victim of handicap discrimination may be barred from bringing a discrimination claim before she knew or reasonably should have known that she had suffered discrimination. In essence, the Supreme Judicial Court has interpreted the statutory limitations period in §9 providing that a plaintiff must file suit alleging handicap discrimination “not later than three years after the alleged unlawful practice occurred" to mean that a plaintiff must file suit alleging handicap discrimination not later than three years after the plaintiff knew or reasonably should have known that the alleged unlawful practice had occurred.
This Court has no doubt that a similar interpretation would be given to the one-year statute of limitations for discrimination in housing. Here, it is plain that the Complaint alleges that the defendant lenders *100 did not make known to borrowers that their race or ethnicity was a factor used in calculating the points and fees they would be charged, and that for many borrowers, perhaps most or even all, a substantial period of time elapsed before they knew or should have known that they had been victimized by discrimination. Consequently, even if this Court were to interpret the Complaint as alleging serial violations, it would not be appropriate to dismiss the discrimination claim as to all loans issued before June 3, 2007 because the Attorney General would be entitled to argue that the borrowers did not know and reasonably should not have known of the discrimination they had suffered until after June 3, 2007.
While this is sufficient to deny the motion to dismiss, the Attorney General argues an alternative ground to defeat the defendants’ statute of limitations argument — she contends that the discrimination claim alleges a systemic violation of G.L.c. 15 IB, that is, “the maintenance of a general practice or policy aimed at members of a protected class ...” Id. at 643 n.14, quoting Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531-32 n.12 (2001). She contends that, to the extent that the discrimination alleged is based on a discriminatory practice or policy, under the continuing violation doctrine the claim of housing discrimination is timely filed if the practice or policy continued beyond June 3, 2007, which she alleges it did. See Provencher v. CVS Pharmacy, Division of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998), quoting Sabree v. United Broth. of Carpenters andJoiners Local No. 33, 921 F.2d 396, 400 n.7 (1st Cir. 1990) (“A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint”). Cf. Cuddyer, 434 Mass. at 531-34 (adopting the continuing violation doctrine in sexual harassment cases alleging a hostile work environment).
In Miller v. Countrywide Bank, N.A., Judge Nancy Gertner of the United States District Court for the District of Massachusetts considered a motion to dismiss in a case comparable to this in which the African-American borrower plaintiffs alleged that Countrywide’s lending policies resulted in African-American borrowers paying “disproportionately high interest and fees on their home loans,” in violation of the federal Fair Housing Act and the Equal Credit Opportunity Act. 571 F.Sup. 2d 251, 254 (D.Mass. July 30,2008). There, too, the defendant lender moved to dismiss on statute of limitations grounds. Judge Gertner denied the motion, noting that the challenged . policy continued into the limitations period. Id. at 262. While that case rested on alleged violations of those federal statutes rather than G.L.c. 15 IB, this Court notes that Massachusetts courts have looked to the Fair Housing Act in interpreting G.L.c. 15IB in cases alleging housing discrimination, see Commonwealth v. Dowd, 37 Mass.App.Ct. 164, 167-68 (1994), and that the continuing violations doctrine applies to discrimination claims brought under the Fair Housing Act. Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982) (concluding that “where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice”). To the extent that the instant Complaint indeed alleges a systemic violation based on a discriminatory practice or policy, this Court joins Judge Gertner in denying the motion to dismiss and adopts her reasoning in doing so.
Option One’s and H&R Mortgage’s second ground for dismissing the discrimination claim is that it alleges a disparate impact claim without the required specificity in alleging a facially neutral policy or practice, the disparate impact, and the facts demonstrating a causal connection between the challenged policy and the alleged disparate impact. See Smith v. City of Jackson, 544 U.S. 228 (2005) (rejecting a disparate impact claim under the federal Age Discrimination in Employment Act because the Complaint lacked the required specificity). The Complaint alleges that Option One’s and H&R Mortgage’s Pricing Policy had two elements: (1) an objective element, referred to as the “Par Rate,” which calculated rates, points, and fees for mortgage loans based on such risk-related characteristics of the borrower as the FICO score (named after the Fair Isaac Corporation, which created the credit score model), the loan-to-value ratio, and the debt-to-income ratio; and (2) a subjective element, which gave loan officers both the discretion and incentive to charge higher points and fees to borrowers, and which resulted in disproportionately higher points and fees being charged to black and Latino borrowers. Complaint at ¶¶ 123-127. The Complaint does not specify what policy or practice was embedded within that subjective element that resulted in this disparate impact.
The allegations in the instant Complaint are veiy similar to those made against Countrywide Bank in Miller. Faced with essentially the same argument of a failure of required specificity, Judge Gertner wrote:
Where the allocation of subjective decisionmaking authority is at issue, the “practice” amounts to the absence of a policy that allows racial bias to seep into the process. Allowing this “practice” to escape scrutiny would enable companies responsible for complying with anti-discrimination laws to “insulate” themselves by “refrain[ing] from making standardized criteria absolutely determinative.” Watson v. Fort Worth Bank, 487 U.S. 977, 990 (1988). This is especially the case in this context. Unlike in the employment context, subjective criteria, unrelated to creditworthiness, should play no part in determining a potential borrower’s eligibility for credit.
*101 Accordingly, I find that plaintiffs have identified a sufficiently specific policy.
Miller, 571 F.Sup.2d at 258. This Court, for the reasons she stated, joins Judge Gertner in this matter. Consequently, assuming that a disparate impact claim under G.L.c. 151B requires the same degree of specificity as a comparable claim under a federal anti-discrimination statute (a legal issue this Court expressly does not decide), this Court finds that the Attorney General has pleaded with sufficient specificity to defeat the defendants’ motion to dismiss. Consequently, the defendants’ motion to dismiss the discrimination claim is denied.
Option One’s and H&R Mortgage’s Motion to Compel Arbitration
Roughly one-quarter of the mortgage loan agreements entered into by Option One and H&R Mortgage with Massachusetts borrowers included an agreement to arbitrate disputes under the Federal Arbitration Act (“FAA”), 9 U.S.C. §2. These agreements provided:
[I]f you and we are not able to resolve our differences informally, you and we agree that any dispute, regardless of when it arose, shall be settled, at your option or ours, by arbitration in accordance with this Agreement... This Agreement shall also apply to any dispute with our agents, successors or assigns . . .
For purposes of this Agreement, a dispute is any claim or controversy of any nature whatsoever arising out of or in any way related to the Loan; the arranging of the Loan; any application, inquiry or attempt to obtain the Loan; any Loan documents, the servicing of the Loan, or any other aspect of the Loan transaction. It includes, but is not limited to, federal or state contract, tort, statutory, regulatory, common law and equitable claims . . .
Option One and H&R Mortgage now seek to invoke what they contend is their entitlement to arbitrate the loan disputes involving the borrowers who entered into such arbitration agreements by asking this Court to compel the Attorney General to arbitrate these disputes. The Attorney General responds that she has no obligation to arbitrate these disputes because she did not enter into any agreement to arbitrate. Moreover, she contends that she is not simply acting on behalf of these individual borrowers but is fulfilling her statutory authority under G.L.c. 93A, §4 to file suit “in the public interest" on behalf of all the people of the Commonwealth. See G.L.c. 93A, §4. This Court agrees with the Attorney General that she may not be compelled to arbitrate these disputes.
In Equal Employment Opportunity Commission v. Waffle House, Inc., the United States Supreme Court was faced with the comparable question of whether the Equal Opportunity Employment Commission (“EEOC”) could pursue victim-specific judicial relief in federal court on behalf of an employee who had signed an agreement with his employer to settle all disputes through binding arbitration. 534 U.S. 279, 282 (2002). The Court held that the employee’s arbitration agreement did not obligate the EEOC to proceed to arbitration. The Court recognized that the Congressional purpose behind the FAA “was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.” Id. at 289, quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991). The Court noted that 9 U.S.C. §§3 and 4 of the FAA manifests “a liberal federal policy favoring arbitration agreements,” quoting Gil-mer, 500 U.S. at 25, but made clear that the FAA did not authorize a court to compel arbitration by any party not covered in the agreement or place any restriction on a non-party’s choice of judicial forum. Equal Employment Opportunity Commission, 534 U.S. at 289. The Court wrote, “The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it ‘does not require parties to arbitrate when they have not agreed to do so.’ ” Id. at 293, quoting Volt Information Services, Inc. v. Board of Trustee of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989). The Court concluded:
No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims. It goes without saying that a contract cannot bind a nonparty. Accordingly, the proarbitration policy goals of the FAA do not require the agency to relinquish its statutory authority if it has not agreed to do so.
Id. at 294.
The Supreme Court also recognized that the EEOC “may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.” Id. at 296. The Court noted that, when the EEOC files suit on its own, “the employee has no independent cause of action, although the employee may intervene in the EEOC’s suit.” Id. at 291. It also noted that the EEOC took the position that “it may pursue a claim on the employee’s behalf even after the employee has disavowed any desire to seek relief.” Id. Referring to the federal statute governing the EEOC, the Court declared:
The statute clearly makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake. Absent textual support for a contrary view, it is the public agency’s province — not that of the court — to determine whether public resources should be committed to the recovery of victim-specific relief. And if the agency makes that determination, the statutory text unambiguously authorizes it to proceed in a judicial forum.
Id. at 291-92.
*102 Each of these arguments apply with at least as much force to the Massachusetts Attorney General as they did to the EEOC. The Attorney General signed no agreement to arbitrate with any of the defendants, so the FAA cannot compel her to prosecute her claim in an arbitral rather than a judicial forum. Just as the EEOC has the statutory authority to file suits on its own under 42 U.S.C. §2000e-5(f)(1), so, too, does the Attorney General have the statutory authority under G.L.c. 93A, §4 to prosecute claims in the public interest when she has reason to believe that injunctive relief is necessary to prevent an unfair or deceptive act or practice in violation of G.L.c. 93A, §2. G.L.c. 93A, §4. She, too, may proceed on her own, without the consent and even over the objection of the alleged victim, if she believes that the public interest requires the case to proceed. See id. Consequently, the Attorney General, like the EEOC, is not limited to representing the interests of the particular victim on whose behalf she takes legal action; she is specifically empowered to act in the “public interest” to protect all of the residents of this Commonwealth from the alleged unlawful practices in violation of G.L.c. 93A, §2. She may not be limited in her choice of forum by a contractual agreement to arbitrate that she did not join and that she believes may diminish her ability to protect the public interest from the unlawful practices she seeks to enjoin. See State v. Cross Country Bank, Inc., 703 N.W.2d 562, 566, 569-71 (Minn.Ct.App., 2005) (holding that Minnesota Attorney General could seek victim-specific relief against credit card company for its tortious invasion of privacy in court of law even though the credit card customers had signed arbitration agreements, noting that the state’s purpose in bringing the claim was to protect the public interest); People v. Coventry First, LLC, 2007 WL 2905486, N.Y. Slip Op. 33089 at 12 (N.Y.Sup.Ct. 2007), affd, 2008 N.Y. Slip Op. 5548 (N.Y.App.Div. 1st Dep’t 2008) (allowing New York Attorney General to pursue victim-specific relief for life insurance policyholders in court of law even though some policyholders had signed arbitration agreements).
Moreover, while this Court would deny the motion to compel the Attorney General to arbitrate her claims here even if the arbitration agreement signed by these borrowers was as broad as that signed by the employee in Equal Employment Opportunity Commission v. Waffle House, Inc., it is worthy of note that Option One’s arbitration agreement contains a provision that was absent from Waffle House’s agreement. The Option One arbitration agreement includes the following paragraph:
Only disputes involving you and us may be addressed in the arbitration. The arbitration may not address any dispute on a “class action” basis. This means that the arbitration may not address disputes involving other persons which may be similar to the disputes between you and us.
As a result of this paragraph, under the terms of the Option One arbitration agreement, this action brought by the Attorney General would fall outside the scope of arbitrable disputes because this dispute involves more than “you and us.” The Attorney General’s Complaint, although not formally a class action, seeks relief for a class of borrowers, of which roughly 75 percent have not executed any arbitration agreement. Any arbitration would need to “address disputes involving other persons which may be similar to the disputes between you and us,” because the Complaint alleges policies and practices that are not unique to a single borrower.
Indeed, if Option One’s motion to compel arbitration were allowed, the Attorney General, as a result of this paragraph, would need to enter into a separate arbitration for each borrower whose loans are at issue. Therefore, what is at stake in this motion is not simply the forum where the Attorney General prosecutes her claim, but the ability of the Attorney General to have a single forum to prosecute her claim. Since the Attorney General, with her limited resources, could not realistically prosecute thousands of separate arbi-trations, this motion to compel arbitration is a backdoor motion to dismiss. For all these reasons, Option One’s and H&R Mortgage’s motion to compel arbitration is denied.
H&R Block’s and Block Financial’s Motion to Dismiss for Lack of Personal Jurisdiction
The corporate grandparent of Option One and H&R Mortgage, H&R Block, and their corporate parent, Block Financial, have moved to dismiss the claims against them for lack of personal jurisdiction.
H&R Block contends that it is the master holding company in the H&R Block corporate family, that it is located in Missouri, that it is not authorized to do business in Massachusetts and has no registered agents or property within the Commonwealth, and that it has no contacts whatsoever with Massachusetts or its citizens. Block Financial, itself a wholly-owned subsidiary of H&R Block, contends that it is the parent company to the holding company, OOMC Holdings, LLC, which has several direct subsidiaries, including Option One. (H&R Mortgage is a subsidiary of Option One, so it is an indirect subsidiary of Block Financial.) Block Financial’s relationship to Massachusetts is more complicated than H&R Block’s. Although a Delaware corporation headquartered in Missouri, it is registered as a foreign corporation to do business in Massachusetts, leases office space in Cambridge, Massachusetts, and until January 1, 2008 employed information technology associates at its Cambridge office. Although it did not issue any loans, it acknowledges that the Complaint alleges that it guaranteed the debt issued by Option One, and it does not appear to dispute this allegation.
The law governing personal jurisdiction is not materially in dispute. To establish jurisdiction, the plain *103 tiff bears the burden of showing that personal jurisdiction is authorized by the Massachusetts Long-Arm statute, G.L.c. 223A, §3 and is consistent with the due process guarantees of the United States Constitution. See Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 3-4 (1979). Under the Long-Arm statute, a Massachusetts court may exercise personal jurisdiction over an entity if the entity has transacted business in Massachusetts, directly or through its agent, or if the cause of action arises from the entity’s transaction of business in Massachusetts. Id. at 6; G.L.c. 223A, §3(a). It may also exercise jurisdiction over an entity if the entity caused tortious injury in Massachusetts by an act or omission outside of Massachusetts “if (it) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the Commonwealth.” G.L.c. 223A, §3(d). Massachusetts courts interpret the Long-Arm statute to assert jurisdiction over a non-resident to the fullest extent permitted by due process. Heins v. Wilhelm Loh Wetzlar Optical Machinery GMBH & Co., 26 Mass.App.Ct. 14, 16 (1988).
Due process is satisfied if the entity had “some minimum contact with the Commonwealth which resulted from an affirmative, intentional act of the defendant, such that it is fair and reasonable to require the defendant to come into the State to defend the action.” Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. at 7. When the cause of action specifically arises out of the non-resident’s activities in Massachusetts, a Massachusetts court may take specific jurisdiction over the non-resident even if it does little business within Massachusetts. See Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir. 1995). When the cause of action does not specifically arise out of the non-resident’s activities in Massachusetts, a Massachusetts court may take general jurisdiction over the non-resident, but only if its activities within Massachusetts are substantial or continuous and systematic. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984).
The most common approach to resolve a motion to dismiss for lack of personal jurisdiction is for the court to rely solely on affidavits and other written evidence without conducting an evidentiary hearing, and determine “whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.” Cepeda v. Kass, 62 Mass.App.Ct. 732, 737 (2004), quoting Boit v. Gar-Tec Prod., Inc., 967 F.2d 671, 675 (1st Cir. 1992). “Use of this prima facie standard to determine personal jurisdiction preliminarily reserves the jurisdictional issue, unless waived by the defendant, for final determination at the trial, pursuant to a preponderance of the evidence standard.” Cepeda, 62 Mass.App.Ct. at 737. “The prima facie showing of personal jurisdiction must be based on evidence of specific facts set forth in the record.” Id., quoting Boit v. Gar-Tec Prod., Inc., 967 F.2d at 675. “In evaluating a prima facie showing, the court acts as a data collector, not as a fact finder.” Cepeda, 62 Mass.App.Ct. at 737-38. “In conducting the requisite analysis under the prima facie standard, we take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiffs jurisdictional claim.” Id. at 738, quoting Massachusetts Sch of Law at Andover, Inc. v. American Bar Assn., 142 F.3d 26, 34 (1st Cir. 1998). “The burden is one of production, not one of persuasion.” Cepeda, 62 Mass.App.Ct. at 738.
With regard to Block Financial, the Attorney General contends that Block Financial’s own admissions are sufficient to establish a prima facie case of both specific and general jurisdiction — it is registered to do business in Massachusetts, leases space in Massachusetts, retained employees who were located in Massachusetts when the allegedly fraudulent loans were issued, and guaranteed the debt issued to Option One that Option One then used to issue the loans in question. With regard to H&R Block, the Attorney General relies on alter ego and agency theories to establish jurisdiction, since it recognizes that, “(i]n general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary’s contacts with the forum.” Donatelli v. Nat’l Hockey League, 893 F.2d 459, 465 (1st Cir. 1990). To establish jurisdiction on an alter ego theory, the Attorney General must provide prima facie evidence of “active direct participation by the representatives of [H&R Block], apparently exercising some form of pervasive control” over Option One or H&R Mortgage. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 619 (1968). To establish jurisdiction on an agency theory, the Attorney General must provide prima facie evidence that Option One or H&R Mortgage is the general agent of H&R Block in Massachusetts, performing services in Massachusetts that “are sufficiently important to the [parent] that if it did not have a representative to perform them, the [parent’s] own officials would undertake to perform substantially similar services.” Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405-06 (9th Cir. 1994).
No Rule 30(b)(6) depositions have yet been conducted of either Block Financial or H&R Block, so the Attorney General, at least as to H&R Block, largely relies on H&R Block’s assertions in its Form 10-K filed with the Securities and Exchange Commission for its prima facie showing. It would be unfair for this Court to determine now, on this record, whether the Attorney General has provided evidence sufficient to make a prima facie showing of personal jurisdiction against both Block Financial and H&R Block when the Attorney General has yet to have an adequate opportunity *104 to conduct jurisdictional discovery. See Tatro v. Manor Care, Inc., 416 Mass. 763, 764 (1994) (evaluating the evidence of personal jurisdiction after jurisdictional discovery); Good Hope Industries, Inc. v. Ryder Scott Co., 378 Mass. at 2 (same). Therefore, this Court shall grant the Attorney General sixty days from the date of this Order to conduct jurisdictional discovery, will reserve decision on the motion to dismiss, and will allow the Attorney General to supplement her prima facie showing within ninety days.
American Home’s Motion to Dismiss for Failure to State a Claim
American Home did not issue any of the allegedly predatory loans at issue in this case. Rather, American Home is a defendant in the Complaint solely because, on April 30, 2008, before the Complaint was filed but after the Attorney General had begun negotiating a possible resolution of this dispute with Option One and H&R Mortgage, American Home purchased the right to service all 9,755 loans to Massachusetts borrowers originated by Option One and H&R Mortgage. The Complaint alleges that American Home entered into the asset sale having been forewarned of the likelihood of this litigation, since American Home knew before closing on the sale that the Attorney General was investigating Chapter 93A claims against the H&R Block family of defendants and was prepared to file suit on those claims. The Complaint does not allege that American Home itself has engaged in any unfair or deceptive act or practice with respect to its servicing of the loans it purchased. Yet, the Attorney General has named American Home as a defendant in both its Chapter 93A and discrimination claims.
American Home now moves to dismiss those claims for failure to state a claim. The gist of its argument is that it cannot be found liable for unfair or deceptive acts or practices or for discrimination in the absence of any allegation that it engaged in any such unlawful conduct. It cites G.L.c. 93A, §4 as endorsing this fundamental precept:
Whenever the attorney general has reason to believe that any person is using or is about to use any method, act, or practice declared by section two to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the commonwealth against such person to restrain by temporary restraining order or preliminary or permanent injunction the use of such method, act or practice.
G.L.c. 93A, §4 (italics added). Focusing on the italicized words, American Home argues that the Attorney General may only bring an action under §4 against a person who has itself engaged in methods, acts, or practice that are unlawful under G.L.c. 93A, §2.
American Home’s argument finds support in more than this sentence in §4. Later in §4, the statute declares:
If the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two, the court may require such person to pay to the commonwealth a civil penally of not more than five thousand dollars for each such violation and also may require the said person to pay the reasonable costs of investigation and litigation of such violation, including reasonable attorneys fees.
Id. By this sentence, the Legislature intended that only those who actually engaged in unlawful conduct in violation of G.L.c. 93A, §2 should face the prospect of paying civil penalties, the costs of investigation, and attorneys fees. It plainly did not wish to impose these penalties and costs upon a person who was blameless.
The Attorney General observes that, if American Home is not a defendant in this action, the Court may have no practical means to provide an equitable remedy to borrowers who were the victims of the alleged unfair, deceptive, and discriminatoiy acts and practices committed by the H&R Block family of defendants. The Attorney General’s fears are well warranted. When this Court asked American Home’s attorney, hypothetically, what equitable remedy would be available to the Court to protect borrowers who had been victimized by a lender’s egregious deception in the issuance of home mortgage loans if the lender immediately sold both the loans and the servicing rights to an innocent third party, her answer was that an equitable remedy would only be available in three circumstances: (1) the injunction had issued before the loans were transferred, (2) the third party was complicit with the lender in the unfair or deceptive practice, or (3) the asset sale was not a bona fide, arms-length transaction. In short, if American Home is correct as to the limitations of G.L.c. 93A, §4, a court could equitably do little for a victimized borrower if her lender had quickly sold her loan and the rights to service it.
While G.L.c. 93A, §4 does not permit a blameless person to be assessed civil penalties, investigation costs, or attorneys fees, it also does not leave the Court helpless to remedy wrongdoing. The statute specifically empowers courts to “make such other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason of the use or employment of such unlawful method, act or practice any moneys or property, real or personal, which may have been acquired by means of such method, act, or practice.” G.L.c. 93A, §4. The Supreme Judicial Court has said that, even before this language was added in 1969 to §4, “G.L.c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective.” Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974). The addition of this language clarified that authority of the court. Id.
*105 These two provisions of §4 can be harmonized by permitting a blameless person or entity who is a necessary party to effectuate an adequate equitable remedy to be named as a defendant solely for the purpose of accomplishing the equitable remedy, much as a reach and apply defendant is a defendant for the limited purpose of holding funds that may ultimately belong to a successful plaintiff. In the context of this case, that means that American Home, based on the allegations in the instant Complaint, would not be subject to civil penalties or the payment of the costs of investigation or attorneys fees, but would remain as a defendant for the limited purpose, if needed, of providing the alleged victims of the mortgage loan fraud with an equitable remedy. Effectively, this imposes upon those who purchase these loans the risk that, if the loans they purchased were unfair or deceptive, they may be ordered to help remedy that unfairness or deception. This Court does not find that allocation of risk to be unfair, especially here, when American Home purchased these assets after having been specifically warned of the Attorney Generals’s allegations and intentions.
Consequently, this Court allows American Home’s motion to dismiss only to the extent that American Home is not subject to civil penalties or the payment of the costs of investigation or attorneys fees. The motion is denied to the extent that American Home remains a defendant for the limited purpose, if needed, of providing the alleged victims of the mortgage loan fraud with an adequate equitable remedy.
Commonwealth’s Motion for Preliminary Injunction
The Commonwealth has moved for what it characterizes as a “narrowly tailored” preliminary injunction to protect Massachusetts borrowers from what it contends is the defendants’ unfair and deceptive conduct in selling thousands of high-risk subprime loans to Massachusetts borrowers. The Commonwealth asks this Court to order that, before “initiating or advancing any foreclosure,” the defendants give the Attorney General 90 days advance written notice of its intent to foreclose, along with a complete copy of the loan origination file and loan servicing file. The Attorney General, within this 90 day period, would determine whether it believes that unfair or deceptive conduct occurred with respect to the loan and whether it would object to foreclosure. If the Attorney General were to object, she would provide the defendants with a written statement setting forth the reasons for her objection. During the next 15 days following the objection, the Attorney General and the defendants would seek to resolve their differences, essentially determining whether a reasonable workout could be arranged to avoid foreclosure. If common ground were found, the Attorney General would withdraw her objection. If no agreement could be reached, the defendants could proceed to foreclosure only with the prior approval of this Court.
Recognizing that the preliminary injunctive relief this Court allowed in its Fremont Decision was far narrower than the relief she sought, the Attorney General has proposed three separate preliminary injunctions, all seeking the same relief but differing in the scope of the loans they would cover. Under the Attorney General’s most preferred preliminary injunction, this 90-day review procedure would apply to any foreclosure on any Massachusetts mortgage loan issued by Option One or H&R Mortgage. Under her second choice preliminary injunction, the 90-day review procedure would apply to all Massachusetts mortgage loans issued by Option One or H&R Mortgage secured by the borrower’s principal residence in which either the loan was a stated income or no documentation loan or.
1. the loan was an adjustable rate mortgage with an introductory rate period of three years or less,
2. the borrower has a debt-to-income ratio that would have exceeded 45% if measured by the debt due under the fully-indexed rate rather than the introductory rate, and
3. The loan-to-value ratio is 90 percent or greater, or the loan carries a prepayment penalty or a prepayment penalty that extends beyond the introductory rate period.
Under her third choice, the 90-day review procedure would apply to all Massachusetts mortgage loans secured by the borrower’s residence issued by Option One or H&R Mortgage in which either the loan was a stated income or no documentation loan or.
1. the loan was an adjustable rate mortgage with an introductory rate period of three years or less,
2. the loan has an introductory or “teaser” rate that is at least 2 points lower than the fully-indexed rate,
3. the borrower has a debt-to-income ratio that would have exceeded 45% if measured by the debt due under the fully-indexed rate rather than the introductory rate, and
4. The loan-to-value ratio is 90 percent or greater, or the loan carries a prepayment penalty or a prepayment penalty that extends beyond the introductory rate period.
Findings of Fact and Conclusions of Law
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). In other words, in finding the facts on a motion for preliminary injunction, this Court must “play the cards it is dealt,” which may be a far more modest deck than it may be dealt at trial, after discovery has been completed. Consequently, the preliminary findings of fact below are based on the affidavits and attached exhibits fur *106 nished by the parties, as well as reasonable inferences from that evidence.
In determining whether to grant a preliminary injunction based on the preliminary findings of fact, this Court must perform the three-part balancing test articulated in Packaging Industries Group, Inc., 380 Mass. at 616-17. First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 &n. 11. Third, “[i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the parly’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. When the preliminary injunction is sought by the Attorney General, this Court must also consider whether a preliminary injunction would serve the public interest. Commonwealth v. ELM Medical Laboratories, Inc., 33 Mass.App.Ct. 71, 83 (1992). See also Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
To justify the scope of the relief sought in its most preferred preliminary injunction, which would cover all of Option One’s and H&R Mortgage’s loans issued in Massachusetts, the Attorney General would need to demonstrate, at a minimum, that she was likely to prevail in proving that all (or nearly all) of the loans issued by these defendants were unfair or deceptive. This Court finds that the Attorney General has failed to establish the proof needed for a preliminary injunction of this scope.
Focusing first on whether there is evidence that Option One and H&R Mortgage were pervasively deceptive in the issuance of mortgage loans, this Court finds that the record, at least for purposes of a preliminary injunction, falls short of that mark. The Attorney General has submitted the affidavits of six borrowers. The strongest is that of WC[3] who received telephone calls and letters from Option One encouraging her to refinance her home, which she and her husband decided to do in order to get $30,000 in cash to renovate her home so as to better serve her day care business, which operated out of her home. She was promised a fixed rate by various Option One agents based on the quality of her credit score but, just before she was scheduled to close on the refinancing, she was told by Option One that she would not get a fixed rate but instead a thirty-year adjustable rate mortgage whose introductory 7.45 percent APR would likely substantially increase after two years. She was assured by Option One agents that, if she paid her mortgage and other bills on time, she would be able to refinance after one year into a fixed rate mortgage. She and her husband decided to proceed with the refinancing. A year later, after having paid her bills on time for that year, she telephoned Option One to refinance into a fixed rate mortgage and was told that she was not eligible because her loan-to-value ratio was over 90 percent.
This last minute “bait and switch” by Option One agents, combined with assurances of refinancing by Option One, would be extremely troubling if they reflected a pattern of conduct by Option One. However, only one other borrower, EC, described a “bait and switch” and assurances of refinancing, and, for EC, the bait and switch was done by his broker, who was not an employee or agent of Option One, and the assurance of refinancing came from the attorney retained by Option One at the time of closing, who appeared to be describing typical practice in the industry rather than making an affirmative promise.[4] EC, in any event, would not reasonably have qualified for refinancing because he missed loan payments before his interest rate had adjusted as a result of financial problems that were unrelated to Option One.
TD and her husband chose to refinance the home her husband owned with Option One after receiving telephone calls inviting her to do so. She attested that she thought she had entered into two fixed-rate mortgages, one for $232,000 at 6.9 percent and another for $50,000 at 9 percent, and only later learned that the $232,000 loan was fixed for only the first two years of the loan and was thereafter adjustable. However, Option One used the required federal Truth-in-Lending disclosure forms at her closing (actually her husband’s closing, since she was not the actual borrower on the loan), which disclosed that the larger loan had an adjustable rate. TD did not identify anyone in her affidavit who told her she was getting a fixed rate loan. Indeed, the evidence in the record suggests that Option One’s written disclosures to borrowers were clearer than the industry norm.
DJ and her husband were first-time homebuyers who relied upon the advice of a broker unrelated to Option One to enter into two mortgages, one an adjustable rate mortgage with a two-year fixed introductory rate for $212,000 and the other a fixed-rate loan for $52,609.95. When DJ expressed concern to the broker about the adjustable rate feature of the larger loan, he told her that he would call her several months before the end of the introductory period and refinance her into a fixed rate loan. She fell behind in her payments after her husband was injured and could no longer work. When she spoke with another lender about refinancing, the other lender told her not to make any further payments to Option One, but that lender ultimately refused to refinance. She then asked Option One for a loan modification but, having missed multiple payments, Option One declined. She entered into a Forbearance Agreement with Option One to save *107 her home from foreclosure but has been confused as to how her monthly payments have been applied.
DD’s loan was not issued by Option One but was transferred to Option One for servicing within the first year. DD fell behind in his loan payments and entered into a Forbearance Agreement with Option One. His primary complaint about Option One is the sloppy manner in which it has serviced his loan, primarily its claim that he had missed his July 2007 payment even though he had sent the payment by wire and provided Option One a copy of the wire transaction record. As noted earlier, Option One has not serviced his loan since April 30, 2008, since the servicing of all Option One loans was transferred then to American Home.
MG is the least credible of the affiants. He obtained a loan refinancing from Option One on his home through his broker, who had no affiliation with Option One. He inflated his income by at least a factor of two to qualify for the loan, which he never could have afforded, since the annual payments exceeded his annual income. He obtained a loan modification from Option One in January 2008 which increased his loan principal by nearly $40,000, and has been frustrated by Option One’s failure to provide him with a detailed breakdown justifying the increase in principal.
Apart from these affidavits, the Attorney General has submitted the affidavit of a paralegal in her Consumer Protection Division who has processed the 113 complaints received from Option One and H&R Block borrowers. The paralegal seeks to summarize the roughly 80 consumer complaints as to how Option One loans were sold to consumers, but this hearsay testimony plainly may not be relied upon by the Court in deciding whether to issue a preliminary injunction.
These affidavits fall well short of establishing a likelihood that the Attorney General will prevail in proving pervasive deception by Option One or H&R Mortgage in the issuance of loans. Apart from these affidavits, the Attorney General’s evidence of deception essentially rests on two other pieces of evidence. First, a brochure published by H&R Block Mortgage, titled “The H&R Block Mortgage Home Advantage,” promised as part of its Smart Homebuyer Program to team a prospective borrower with a Loan Consultant who would provide a “personalized financial assessment without cost or obligation” to help the borrower understand “[h]ow much home you can comfortably afford.” In answer to the rhetorical question posed in the brochure, “I thought you guys were tax people! Why should I trust you with my mortgage?,” the brochure attempted to make use of the goodwill enjoyed by H&R Block tax return advisors: “It simply makes sense to let the trusted professionals who work with your finances handle your most important investment — your mortgage.” The Attorney General argues that there is no evidence that any borrower obtained the promised “personalized financial assessment” and that H&R Block Mortgage was attempting to invite a wholly unearned trust from customers based on unrelated tax advising. This Court credits these points, but also observes that there is no evidence of any borrower attesting that he had read the brochure or in any way relied upon its assertions in deciding to obtain a loan through H&R Mortgage or Option One.
Second, the Attorney General points to Option One’s and H&R Mortgage’s commission structure, which paid loan officers in May 2007 roughly twice as much for each funded subprime loan as for a comparable prime loan, as proof that Option One and H&R Mortgage were pushing borrowers whose FICO scores qualified them for prime loans into subprime loans which cost them more in points and fees. This Court certainly understands that this commission structure gave loan officers the financial incentive to do this but the Attorney General has offered no evidence of it actually happening to any borrower.
Finally, the Attorney General argues that, at a minimum, all “stated income” or “no documentation" loans should be found deceptive because Option One and H&R Mortgage solicited, encouraged, or invited borrowers to submit false information in such loan applications, knowing that the borrower could inflate his or her income or assets without fear that those false assertions would be contradicted by income tax returns or monthly bank statements. None of the six borrower affiants support this assertion; nor is it supported by any Option One or H&R Mortgage internal document encouraging or inviting such misconduct. To the contrary, Option One routinely audited random loan files to detect possible misconduct by the mortgage brokers with whom it did business, and refused to accept loan applications from those brokers found to have engaged in a pattern of misconduct. While the practice of accepting loan applications without the usually required documentation surely increases the risk that brokers or borrowers would falsify loan applications, this Court continues to be unwilling to find that the risk inherent in this practice is sufficient alone to support a finding of deception under Chapter 93A. At the veiy least, there must be evidence that the lender gave a “wink or a nod” to such falsification, and there is no such evidence in this preliminary record.
In short, on this record, the Attorney General has failed to demonstrate a likelihood that the Commonwealth will prevail in proving that Option One or H&R Mortgage pervasively engaged in deceptive loan practices in the issuance of loans. Having so found, this Court must now turn to the issue of whether the Commonwealth has demonstrated a likelihood of prevailing on its claim that the loans themselves were unfair because they were issued with reckless disregard of the risk of foreclosure.
In this Court’s Fremont Decision, this Court found that it is an unfair act in violation of G.L.c. 93A, §2 for a lender to issue an adjustable rate home mortgage loan secured by the borrower’s principal dwelling that the *108 lender reasonably should expect the borrower would be unable to afford to pay or be able to refinance once the introductory period ends unless the fair market value of the home has increased at the close of the introductory period. In that decision, this Court characterized this as structural unfairness. In this decision, this Court characterizes it as reckless disregard of the risk of foreclosure. The change in this Court’s characterization does not change the character of the unfairness to the borrower — she must cope with the likelihood that her home will be lost to foreclosure once the “teaser” interest rate expires because she cannot afford the mortgage payments at the higher indexed rate and cannot refinance unless the value of her house has increased. As noted earlier, to give practical meaning to this preliminary finding, this Court ruled in the Fremont Decision that any mortgage loan secured by the borrower’s principal dwelling should be presumed to be structurally unfair if the loan possesses four characteristics:
1. The loan is an adjustable rate mortgage with an introductory period of three years or less;
2. The loan has an introductory or “teaser” rate for the initial period that is at least 3 percent lower than the fully indexed rate;
3. The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the introductory rate, but by the debt due under the fully indexed rate; and
4. The loan-to-value ratio is 100 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.
As also noted earlier, the presence of all four of these four characteristics did not require a finding of unfairness. Rather, their presence simply provided a strong enough suggestion of unfairness as to shift the burden of production to the lender to demonstrate that the loan was not actually unfair, perhaps by showing that the borrower had other assets that realistically could have enabled the borrower to meet the scheduled payments and avoid foreclosure, or other reasonable means of obtaining refinancing even if the fair market price of the mortgaged home had fallen. The burden of proving that the loan was unfair remained with the plaintiff borrower.
There is no dispute that Option One and H&R Mortgage issued a significant number of loans that met all four of these characteristics. Option One’s former Director of Loan Performance and Economic Analysis has attested that 411 loans issued by Option One in Massachusetts met all four of these characteristics. Of these 411, 195 were not within the portfolio of loans that were transferred to American Home. The majority of these 195 were paid off by the borrower, probably through a refinancing, but this total also includes loans transferred after origination to another lender (other than American Home) and loans in which the lender already foreclosed or agreed with the borrower to take bank title to the property. Of the 216 loans still within American Home’s portfolio of loans, whose status is better known, 80 percent fell into serious trouble — 88 are currently delinquent, meaning that loan payments have been overdue for 61 or more days, and another 85 had to be modified, no doubt in an effort to avoid foreclosure. Only 43 of these loans were current. In short, the Option One and H&R Mortgage home mortgage loans that, under the Fremont criteria, presumptively appeared at the time of underwriting to pose a high risk of foreclosure not surprisingly did indeed turn out to be at an extraordinarily high risk of foreclosure. Therefore, applying the criteria used in the Fremont Decision, this Court finds that the Attorney General has established a substantial likelihood that the Commonwealth will prevail in proving that Option One and H&R Mortgage acted unfairly in violation of G.L.c. 93A, §2 by issuing a significant number of home mortgage loans with reckless disregard of the risk of foreclosure.
The Attorney General argues that this Court should expand the presumptive criteria in the Fremont Decision to bring a greater number of loans within the scope of a preliminary injunction. She makes essentially three arguments. First, she argues that this Court should drop the required fully-indexed debt-to-income ratio from 50 percent to 45 percent, noting that Option One’s own underwriting standards warned, “When the debt ratio exceeds 45%, particular attention should be given to customers’ prior demonstrated debt management.” This Court will stick with the 50 percent fully-indexed debt-to-income ratio for two reasons. Most importantly, this Court chose the 50 percent figure because the Predatory Home Loan Practices Act provided that, if the borrower’s debt-to-income ratio was 50 percent or less, the borrower was presumed able to make the scheduled payments. G.L.c. 183C, §4. See also 209 CMR 32.34(c) (same). Option One should not be penalized for imposing a more rigorous internal standard. Second, since Option One’s underwriting standards permitted debt-to-income ratios to be calculated based on the “teaser” rate for adjustable rate mortgages that had a two-or three-year introductoxy period, a debt-to-income ratio of 45% for these ARMs would invariably be higher than 45% if the fully indexed rate had been used.[5] Therefore, the 45 percent warning threshold employed at Option One, depending on the difference between the “teaser” rate and the fully indexed rate, may approach or exceed 50 percent using the fully-indexed rate.
This Court, however, will make one exception to this rule and drop the debt-to-income ratio threshold from 50 to 45 percent when the borrower had a student loan in which payment had been deferred at least six months from the date of submission of the mortgage loan application. The Option One underwriting policy did not include the amount due on such deferred student loans in the DTI calculation. The consequence of this short *109 sighted policy was that the debt-to-income ratio did not take into account the amount the borrower would be obligated to pay on deferred student loans even when the deferral period was scheduled to end as early as six months from the “date of submission.” Since this underwriting policy considerably understated the debt-to-income ratio of the borrower even before the end of the “teaser” period, this Court will compensate by dropping the DTI threshold to 45 percent for such loans.
Second, the Attorney General asks this Court to drop the requirement that the introductory or “teaser” rate be at least 3 percent lower than the fully-indexed rate. She observes that the critical variables known by the lender’s underwriters that determine the affordability of a loan and the likelihood of refinancing are the debt-to-income and loan-to-value ratios. If these are too high, she argues, the borrower will be unable to afford the loan and will be unable to refinance regardless of whether the loan is fixed or adjustable, or the interest rate discount provided by the “teaser” rate. This Court included as a presumptive factor the interest rate discount provided by the “teaser” rate because Fremont’s underwriters, like Option One’s and H&R Mortgage’s underwriters, generally determined the debt-to-income ratios based on the “teaser” rate, not on the invariably higher fully indexed rate, which allowed borrowers who would otherwise be ineligible for loans under their underwriting standards to be found eligible. The introductory rate was known as the “teaser” rate for a reason — it teased the borrower into thinking that he could afford the loan at that low interest rate when he knew he could not have afforded it at the fully indexed rate. At the close of the introductory period, the greater the difference between the “teaser” rate and the fully indexed rate, the greater the “payment shock” the borrower must cope with if the LIBOR remains the same or goes up. At the time the loan is issued, the greater the difference between the “teaser” rate and the fully indexed rate, the greater the danger that a borrower will enter into a loan he will be unable to afford. Therefore, this Court still believes that the difference between the “teaser” rate and the fully indexed rate should be one of the presumptive criteria for unfairness.
However, this Court also recognizes that the Attorney General has made a valid point and is prepared to modify this criterion accordingly. With the debt-to-income threshold remaining at 50 percent, any borrower whose loan may fall within the presumptive criteria is already on the financial edge, so it does not take so severe a payment shock to put the borrower over the edge into foreclosure. Indeed, the Federal Reserve Board in responding to recent comments regarding its proposed new federal lending regulations has observed, “Payment increases on 2-28 and 3-27 ARMs have not been a major cause of the increase in delinquencies and foreclosures because most delinquencies occurred before the payments were adjusted.” 73 Federal Register 44522 at 46, 2008 WL 2900878 (July 30, 2008). In blunter terms, most mortgage loans that fell into delinquency were so carelessly underwritten that the borrower could not afford them even before the payment shock kicked in. Therefore, this Court will revise this second criterion by including all loans with an introductory or “teaser” rate for the initial period that is at least 2 percent lower than the fully indexed rate, and will eliminate this criterion entirely for all loans with a debt-to-income ratio of 55 percent or above.
Third, the Attorney General asks this Court to reduce the loan-to-value ratio in the fourth criterion from 100 percent to 90 percent. This Court imposed a 100 percent loan-to-value requirement (or, in the alternative, prepayment penalties) because it recognized that loans with that high a loan-to-value ratio would be extraordinarily difficult to refinance unless the fair market value of the borrower’s home increased, even if lenders continued to issue loans with a 100 percent loan-to-value ratio, thereby leaving the borrower with the poor choice of accepting foreclosure or paying interest rates he could not afford. The Attorney General correctly observes that borrowers cannot now refinance with anything approaching a 100 percent loan-to-value ratio, but all the presumptive criteria used by this Court were based on information known to the loan underwriter at the time the loan was approved; none of the criteria required any foresight by the lender. If lenders were issuing home mortgage loans with 100 percent loan-to-value ratios, which they were, then it was reasonable for a lender’s underwriter to imagine that a borrower could refinance at a comparably high loan-to-value ratio. Indeed, 15.26 percent of the loans issued by Option One from 2004 through 2007 had a loan-to-value ratio of 100 percent.
However, there was one consideration that this Court did not adequately take into account in the Fremont Decision that calls for a reduction in the fourth criterion from 100 percent to 97 percent — loans that meet the other three criteria and have a loan-to-value ratio of at least 97 percent will be so risky to refinance that a borrower will almost invariably have to pay substantial points and fees as part of any refinancing, which will need to be added to principal in order for the borrower to afford them. Therefore, for all practical purposes, a loan meeting the other three criteria with a loan-to-value ratio of 97 percent will only be able to be refinanced by a loan with a loan-to-value ratio equal to or greater than 100 percent, which will almost certainly not be available to a lender with a 50 percent debt-to-income ratio. Therefore, this Court will revise the fourth criterion to require a loan-to-value ratio of 97 percent or a substantial prepayment penalty or a prepayment penally that extends beyond the introductoiy period.[6]
Option One and HR Mortgage argue that, even if this Court were to adopt in this case the legal findings it made in the Fremont Decision, it should still not issue a comparable preliminary injunction against them for *110 three reasons, which this Court will address in turn. First, they contend that only 420 of the 30,944 Massachusetts loans they issued, or 1.36 percent, met all of the presumptive criteria set forth in the Fremont Decision.[7] More loans would meet the slightly broader criteria just adopted by this Court, but the percentage would still be a small fraction of the loans issued. This reasoning would be persuasive if this Court were contemplating a preliminary injunction that would require American Home to obtain judicial approval before foreclosing on any home mortgage loan initiated by Option One or H&R Mortgage if an agreement cannot otherwise be reached with the Attorney General. However, this Court, as it did in its Fremont Decision, intends to limit its preliminary injunction to require prior judicial approval only for the foreclosure of loans that are presumptively unfair based on these criteria, and then only when an agreement regarding the loan cannot be reached with the Attorney General.[8] With this limitation, the reasoning becomes nonsensical, akin to the bank teller accused of having engaged in a hundred fraudulent transactions defending himself by noting the many thousands of transactions he engaged in without committing fraud. The preliminary injunction is designed to diminish the harm done to borrowers from the issuance of unfair loans; the fact that only a relatively small percentage of the loans were unfair does not lessen the need for such a remedy.
Second, they argue that a preliminary injunction aimed at them would be of no consequence, since they no longer service any of these loans, having transferred the servicing rights on April 30, 2008 to American Home. This argument, however, fails to recognize that, along with the Purchase Agreement which provided for the sale of the servicing rights for these loans, American Home, Option One, and H&R Mortgage also entered into a Cooperation Agreement on April 30, 2008, which included the following provision:
[American Home] will reasonably consult with [Option One] regarding the servicing of any Mortgage Loan in respect of which a Specified Mortgage Loan Claim is made (a “Disputed Loan”), including (a) whether to make any modifications with respect to the Disputed Loan and (b) the content of any correspondence to or other communications with the borrower and any other Governmental Authority or private party involved in the Specified Mortgage Loan Claim. Without limiting the generality of the foregoing, [Option One] will be permitted to direct [American Home] to make any modifications to the Disputed Loan provided that (i) following such direction would not cause [American Home] to violate any contractual obligations of [American Home] under the Servicing Agreement governing the servicing of the Disputed Loan and (ii) [Option One] indemnifies [American Home] from any Liabilities that arise as a result of any Claim that Purchaser violated its contractual obligations under the Servicing Agreement governing the servicing of the Disputed Loan as a result of reasonably implementing the directive of the Company . . .
Cooperation Agreement at §3.2 (emphasis added). In short, Option One specifically reserved the right to direct American Home to modify the terms of disputed loans it serviced, and to indemnify American Home from any liabilities arising from the modification. Therefore, this Court, as part of its preliminary injunction, could accomplish its purpose simply by ordering Option One to direct American Home to make specified modifications to an unfair loan. Option One contends that this would not work, because American Home would not be obliged under the Cooperation Agreement to be bound by Option One’s direction to modify, but American Home’s attorney has represented to the Court that American Home would accept any modification directed by Option One in accordance with the Court’s order even if American Home were not legally subject to the Court’s order. As a result of this provision in the Cooperation Agreement, and American Home’s interpretation of it, this Court need not order American Home to do anything in its preliminary injunction; it can simply order Option One to direct American Home to make the modifications authorized by the Cooperation Agreement.
Third, Option One and H&R Mortgage correctly observe that the preliminary injunction issued in the Fremont Decision preceded by more than two months the effective date of G.L.c. 244, §35A, which gave mortgage holders a 90-day right to cure a default on a residential mortgage note before foreclosure proceedings may be commenced. The Attorney General wants this statutory 90-day period, plus another 90 days advance written notice of the lender’s intent to foreclose, which would postpone any foreclosure for at least six months from the date of default. This Court agrees that the preliminary injunction timetable needs to be adjusted in order to avoid doubling the delay on loans already in default. The preliminary injunction will be revised from that ordered in the Fremont Decision to reflect the additional time given to borrowers under the statute to cure their default and to minimize additional delay. There is no reason why the notice to the Attorney General must await the end of the 90-day statutory period, provided the notice makes clear that foreclosure will in no event be initiated before the expiration of that period.
American Home argues that it should not be a party to a preliminary injunction because there is no allegation that it has engaged in any unfair or deceptive act in servicing the loans since it purchased the servicing rights on April 30, 2008. This Court agrees that American Home should not be a party to the preliminary injunction unless it needs to be in order to accomplish the relief ordered. In view of the Cooperation Agreement and American Home’s interpretation of that Agreement, this Court believes it can accomplish the relief desired from the preliminary injunction without subjecting American Home to its terms. If that belief is not borne out in fact, *111 this Court reserves the right to modify the terms of the preliminary injunction so that it can accomplish the equitable relief it has ordered.
Finally, American Home argues that no preliminary injunction is needed because it is already agreeing with borrowers to modify the terms of many of the mortgage loans it purchased that are in default. This Court recognizes that American Home sensibly has adapted to the changing realities of the marketplace by being more willing to modify loans than it probably had before. In 2005, Option One was able to recover roughly 90 percent of its outstanding debt on a defaulted loan through foreclosure; by the spring of 2008, its percentage recovery through foreclosure had fallen to roughly 49 percent. The diminished value of foreclosure to lenders during this housing crunch, however, is not sufficient to cause this Court to believe that the preliminary injunction is unnecessary. American Home, in deciding whether to modify a loan, does not consider whether the loan itself was unfair; it simply decides whether its losses can be cut more effectively by modification rather than foreclosure. This Court cannot reasonably rely on American Home, on its own, to provide a reasonable remedy to borrowers who have been victimized by an unfair loan. To be sure, this Court expects that the vast majority of unfair loans subject to this preliminary injunction will indeed be modified through an agreement between the Attorney General, Option One, and American Home, but this Court does not believe that the involvement of the Attorney General and, if needed, the Court is irrelevant to what will eventually happen with these loans.
H&R Block and Block Financial argue that the Commonwealth, on this record, has failed to demonstrate a substantial likelihood that it will prevail against them. This Court agrees. Moreover, this Court does not see either H&R Block or Block Financial as necessary parties to accomplish the relief ordered. Therefore, the preliminary injunction ordered below shall apply only to Option One and H&R Mortgage.
ORDER
For the reasons stated above, this Court ORDERS as follows:
1. Option One’s and H&R Mortgage’s motion to dismiss for failure to state a claim is DENIED.
2. Option One’s and H&R Mortgage’s motion to compel arbitration is DENIED.
3. Block Financial’s and H&R Block’s motion to dismiss for lack of personal jurisdiction is RESERVED. This Court grants the Attorney General sixty days from the date of this Order to conduct jurisdictional discovery, and will allow the Attorney General to supplement her prima facie showing within ninety days.
4. American Home’s motion to dismiss is ALLOWED only to the extent that American Home is not subject to civil penalties or the payment of the costs of investigation or attorneys fees. American Home’s motion to dismiss is DENIED to the extent that American Home remains a defendant for the limited purpose, if needed, of providing the alleged victims of the mortgage loan fraud with an adequate equitable remedy.
5.The Attorney General’s motion for a preliminary injunction is ALLOWED to the extent that, pending final adjudication or further order of this Court, this Court ORDERS as follows:
a. A “Reviewable Mortgage Loan” shall mean a mortgage loan issued by Option One or H&R Mortgage that is secured by the borrower’s occupied principal residence and that meets the following four characteristics:
(1) The loan is an adjustable rate mortgage with an introductory period of three years or less.
(2) The borrower has a debt-to-income ratio that would have exceeded 50 percent if the lender’s underwriters had measured the debt, not by the debt due under the introductory rate, but by the debt due under the fully indexed rate, except when the borrower had a student loan in which payment had been deferred at least six months from the date of submission of the mortgage loan application, in which case the debt-to-income ratio need exceed only 45 percent.
(3) The loan has an introductory or “teaser” rate for the initial period that is at least 2 percent lower than the fully indexed rate, unless the debt-to-income ratio is 55 percent or above; and
(4) The loan-to-value ratio is 97 percent or the loan carries a substantial prepayment penalty or a prepayment penalty that extends beyond the introductory period.
b. Option One and H&R Mortgage shall direct American Home to comply with the terms of this preliminary injunction, specifically that:
(1) at least 60 days after providing a borrower the notice of default required under G.L.c. 244, §35A, before initiating or advancing a foreclosure on any mortgage loan that is not a Reviewable Mortgage Loan, American Home shall first give the Attorney General 30 days advance written notice of the proposed foreclosure together with the Loan Documentation (a complete copy of the loan file and loan servicing file) so that the Attorney General can verify that the loan is not a Reviewable Mortgage Loan. If the Attorney General has not given written notice of an objection to American Home by the 30th day, based on her finding that the loan is a Reviewable Mortgage Loan, American Home may proceed with the foreclosure. If the Attorney General has given timely written notice of an objection, American Home shall proceed in accordance with paragraph 5(b)(2) below.
(2) at least 60 days after providing a borrower the notice of default required under G.L.c. 244, §35A, before initiating or advancing a foreclosure on any mortgage loan that is a Reviewable Mortgage Loan, American Home shall first give the Attorney General 45 days advance written notice of the proposed *112 foreclosure together with the Loan Documentation, identifying why foreclosure is reasonable under the circumstances and/or why the Attorney General’s written objection under paragraph 5(b)(1) above is in error. If the Attorney General has not given written notice of an objection to American Home by the 45th day, American Home may proceed with the foreclosure.
(3) If the Attorney General has timely given a written objection under paragraph 5(b)(2) above, the Attorney General, Option One, H&R Mortgage, and/or American Home shall within the next 15 days attempt to resolve their differences regarding the proposed foreclosure. If these differences have been resolved, the Attorney General will notify American Home in writing that she has withdrawn her written objection. If these differences are not resolved, American Home may proceed with the foreclosure only with the prior approval of this Court (or a special master appointed by this Court), which it may seek on the 16th day.
c. In considering whether to approve the foreclosure, this Court will determine (i) whether the loan is actually unfair and is actually secured by the borrower’s primary residence that is both inhabited and inhabitable, (ii) whether Option One, H&R Mortgage, and/or American Home has taken reasonable steps to “work out” the loan and avoid foreclosure, and (iii) whether there is any fair or reasonable alternative to foreclosure. This Court will seek to expedite these decisions but, if the number of such matters grows too large, this Court may need to appoint a special master to assist the Court.
d. Pending final adjudication of this action or further order of this Court, American Home shall not sell, transfer, or assign (i) any mortgage loan originated by Option One or H&R Mortgage that is secured by any residential property in Massachusetts, or (ii) the legal obligation to service any mortgage loan originated by Option One or H&R Mortgage that is secured by any residential property in Massachusetts, unless:
i. American Home gives the Massachusetts Attorney General written notice of its intent to enter into such an assignment, including a copy of the proposed agreement, at least five business days before executing the purchase agreement,
ii. the obligations of this Court’s Preliminary Injunction, including but not limited to this restriction upon further sale, transfer, or assignment, are also assigned with the sale or assignment of the loans or servicing rights,
iii. the assignee agrees in the written assignment to be governed by the terms of the Preliminary Injunction and its obligations, and
iv.a copy of the executed written assignment is provided within five business days of its execution to the Attorney General.
e.Nothing in this Order shall be construed to affect any borrower’s obligation to make monthly mortgage payments with respect to any of the loans at issue in the Complaint.

 In an ARM, the low introductory rate is generally fixed for the first two or three years of the loan, and then is adjusted to a variable rate based on a market rate of interest — the 6-month London Interbank Offered Rate (“LIBOR”) — plus “the rate add” — an additional percentage of interest (known as points) to reflect the high risk of the loan, e.g. LIBOR plus 5. The fully indexed rate is the LIBOR plus the rate add at the time the loan was issued. The “teaser” rate is invariably considerably lower than the fully indexed rate. In most loans, there is a cap on the increase in points that may occur each time the rate adjusts, so the actual interest rate may not immediately reach the fully indexed rate at the first adjustment.

 Indeed, Option One’s own underwriting policies declared: Debt ratio is an important factor when evaluating borrowers’ ability to repay the loan. When the debt ratio exceeds 45%, particular attention should be given to customers’ prior demonstrated debt management.
Option One calculated debt-to-income ratio using the interest payments due under the “teaser” rate, not the fully indexed rate. Since Option One has admitted that the “teaser” rate invariably is lower than the fully indexed rate, a borrower with a 45% debt ratio as calculated by Option One is likely to have a significantly higher debt ratio under the fully indexed rate.

 No protect the privacy of these borrowers and avoid needlessly embarrassing them, this Court will refer to them only by their initials.

 The evidence furnished by the Attorney General failed to demonstrate that Option One or H&R Mortgage knew of broker misconduct and willfully blinded themselves to it or otherwise acquiesced in it. Indeed, the evidence provided by Option One and H&R Mortgage indicated that they had a procedure in place to investigate allegations of broker misconduct and stopped accepting loans from brokers who were found to have engaged in repeated misconduct.

 Somewhat inexplicably, the Option One underwriting policies provided that, for ARMs with a two-or three-year fixed-rate period, the debt-to-income ratio should be based on the “teaser” rate except for fixed income borrowers, whose debt-to-income ratios were calculated using the “teaser" rate plus 3 percent.

 The loan-to-value ratio should be calculated based on all the mortgage loans securing the home. Consequently, if Option One or H&R Mortgage issued two mortgage loans — a first mortgage for 80 percent of the value of the home and a second mortgage for 20 percent — the loan-to-value ratio of both loans would be 100 percent, since any lender contemplating refinancing either mortgage would view the loan-to-value ratio as 100 percent.

 The percentage would be 1.97 percent if only adjustable rate mortgages were counted, omitting fixed rate mortgages.

 It should be noted that, even though the Fremont preliminary injunction issued on February 25, 2008, Fremont has yet to ask the Court’s permission to foreclose on a single mortgage. This is a testament both to the limited scope of the preliminary injunction and the ability of Fremont and the Attorney General to reach agreement on the loans within its scope.