Lauriat, Peter M., J.
This action arises out of two mortgage loans made by defendant Fremont Investment & Loan, n/k/a Fremont Reorganizing Corporation (“Fremont”) to plaintiffs Margarette and Jacques Thelemaque (“the Thelemaques”), to purchase property located at 126-128 Elm Street in Everett, Massachusetts (“the Property”). Defendant People’s Choice Mortgage, Inc. (“People’s Choice”), an independent contractor, was the mortgage broker for the transaction. [1] Now before the court are motions for summary judgment and partial summary judgment brought by Fremont and People’s Choice, respectively. For the following reasons, both motions are allowed in part and denied in part.
BACKGROUND
The record before the court reveals the following facts, taken in the light most favorable to the plaintiffs as the non-moving party.[2] The plaintiffs are Haitian immigrants whose language is Haitian Creole, and who, at the time of the loan, were renting in Cambridge, Massachusetts. Margarette Thelemaque (“Margarette”)[3] came to the United States in 2001 with the couple’s two children. She had never been employed outside of the home, did not graduate from high school, and has limited ability to speak or understand English. In 2005 she was employed cleaning hotel rooms at the Sheraton Commander Hotel at a rate of $13.50 per hour.[4] Jacques Thelemaque (“Jacques”), who came to the United States in 1989, was employed as a certified nursing assistant, earning $13.50 per hour. He has a high school education and reportedly has some difficulty reading and speaking English. The Thelemaques claim that their monthly income at the time of the application was $4,594.
When the Thelemaques began to explore the possibility of buying a home with a rental unit, Jacques contacted his sister, Andrea Hemy (“Henry”), who had come to the United States in 1982, and who was a licensed real estate agent employed by Dream Home Realty, LLC (“DreamHome”). In 2005, after negotiating a purchase price of $400,000 for the Property, Henry put the Thelemaques in contact with Clayton Kelly (“Kelly”), a mortgage broker employed by People’s Choice. According to Henry’s deposition testimony, she chose Kelly and People’s Choice because People’s Choice was owned by David Fasano, who also owned Dream Home. Kelly had, Henry testified, worked on, her own mortgage.
Both Thelemaques testified in their depositions that Jacques provided Kelly with “two or three previous years of tax return and three or four [of his and his wife’sl current pay stubs.” Neither the stubs nor the W-2 forms are in the record, but Fremont’s Pre-Doc Account Manager’s Checklist indicates that Fremont had in its possession those documents verifying the Thelemaque’s income.[5] Ex. 37. The Thelemaques did not initially qualify for a loan; however some months later Kelly contacted them to inform them that they had been approved. On September 24, 2005, Kelly transmitted to Fremont a “Pre Qual Submission” in Margarette’s name. Although not part of the document itself, handwritten in the margin is the phrase “Priced as full.”[6] On September 29, 2005, Margarette signed a Contract for Services with People’s Choice, a Borrowers’ Certificate and Authorization and a Good Faith Estimate. The Good Faith estimate listed the interest rate as 6.850% and the monthly payment as $2,934.72.[7] Ex. L. It is undisputed that Margarette had no personal communication with Kelly.
*431 People’s Choice claims that it twice mailed two Uniform Residential Loan Applications to the The-lemaques on September 27, 2005, and again on October 17, 2005. The first was for a loan in the amount of $320,000 (the “primary loan”); the second in the amount of $80,000 (the “secondary loan”).[8] The The-lemaques maintain that they did not receive any documents from People’s Choice by mail or otherwise. Nonetheless, it is undisputed that the September 27, 2005 application identifies the primary loan as 2/38 STATED Adjusted Rate Mortgage (“ARM”) with an interest rate of 6.850%, and the secondary loan as fixed interest with a rate of 9.125%.[9] The October 17, 2005 application lists the interest rate as 7.5%. On all the applications, Margarette’s monthly income is listed as $3,200, Jacques’ as $2,700, with a total income of $7,250, including $1,350, representing a percentage of the $1,500 projected income from the rental unit. Accompanying the applications, according to People’s Choice, were Good Faith Estimates, Mortgage Broker Disclosures, Contracts for Services, Loan Origination and Compensation Agreements, and the Counteroffer Letter from Fremont.
The closing, which is the subject of much dispute, was held on October 21, 2005. It was conducted by attorney Natasha Lucien, with the Thelemaques and Henry present. Although accounts of the proceeding differ in many respects, it is undisputed that Lucien spoke only English when explaining the documents that the Thelemaques were required to sign; Hemy testified that she did not translate Lucien’s explanations into Haitian Creole. Margarette, who was the primary borrower, testified that, although she did not understand what Lucien was telling her, she nonetheless signed all the documents without questioning their content. Jacques, as the co-borrower, initialed the documents also without question.
Attached to the mortgage note for the primary loan is an Adjustable Rate and Balloon Payment Rider, stating that the note provides for a change in the interest rate and the monthly payment and requires the borrower to pay the entire note in full at maturity, together with unpaid interest and loan charges due, in one balloon payment.[10],[11] While the mortgage note provides for an “initial” interest rate of 7.5%, or $2,105.83 per month, the rider states that the rate may change on November 1, 2007 and every sixth months thereafter.[12] The new rate would be based on the London Interbank Offered Rate (“LIBOR”) on the date the note was signed plus 5.7431% rounded to the nearest 0.125% (the “fully indexed rate”).[13] The rider also states that the new interest rate at the first change date would not be greater than 9.5% or less than 7.5% and would never be greater than 13.5%.[14] The Thelemaques also signed, for the first time, the Uniform Residential Loan Application, similar to the October 17, 2005 document, described supra.
The Truth-In-Lending Disclosure Statement states that the monthly payment of $2,105.83 would increase after two years to $2,582.58 for six months and then increase to $2,735.88. A balloon payment of $208,854.45 would be due on November 1, 2035, the date of maturity. Ex. E.[15] As part of the loan transaction, Fremont paid People’s Choice a $3,200 “Yield Spread Premium,” listed in the Settlement Statement of HUD-1.[16] It is undisputed that Fremont’s payment to People’s Choice of a Yield Spread Premium of $3,200 increased the Thelemaques’ mortgage interest rate by 0.5% throughout the life of the loan. The Thelemaques signed other documents that contained the same information, including the Lender’s Closing Instructions, the Mortgage Lender Disclosures Required By The Attorney General’s Consumer Protection Regulations, the Consumer’s Guide to Obtaining a Home Mortgage, the Adjustable Rate Mortgage Loan Program Disclosure for LIBOR 6-Month ARM with 2-Year Rate Lock and Balloon Payment, and the Good Faith Estimate. [17]
According to Margarette, the first indication she had that Lucien might speak Haitian Creole was at the end of the closing, when Lucien wished the The-lemaques good luck in that language, and also told them they could refinance in six months. Jacques also testified that he understood that monthly payments would go down, as Lucien told him “after six months we would refinance and the payment would drop down.” Hemy testified that, during a conversation with Kelly prior to the closing, with Jacques present, Kelly told them not to worry about the interest rate “we’re going—I’m going to refinance this for three to six months, just pay the mortgage for three to six months and we’re going to refinance it.” Ex. DD, Hemy Depo. at 276-77. Lucien stated, and Hemy confirmed, that she never told the Thelemaques at the closing that they could refinance and that it was not her policy to do so. Nonetheless, she did explain generally that where, as was the case here, there was no prepayment penally on the loan, the borrower could refinance at any time.
The property required significant repairs and the downstairs unit rented on a sporadic basis at far less than the $1,500 projected by People’s Choice. After six months, in April 2006, Jacques contacted Kelly in order to refinance the property. Although the parties dispute the content of that contact, and a later conversation with a different People’s Choice broker, it is undisputed that the Thelemaques were not able to refinance.[18] Although they were able to make the monthly payments at the initial rate, once the rate increased, they fell into default. The defendants subsequently initiated foreclosure proceedings.
On October 6, 2008, the Thelemaques sent a demand letter, pursuant to G.L.c. 93A, §9, to all the defendants.[19] On November 21, 2008, they filed this action.[20] The thrust of the Thelemaques’ complaint is that the loan was presumptively and structurally un *432 fair under the principles articulated in Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733 (2008) (“Fremont’'). In that respect, the Thelemaques claim that the defendants ignored documentation of their income, falsified the loan application, misled them as to settlement charges and costs, and misrepresented that they could refinance. The result, they argue, was a high cost, sub-prime, predatory home mortgage “made to borrowers who generally would not qualify for traditional loans offered at the generally prevailing rate of interest for conventional mortgages.” Fremont, 452 Mass. at 735 n.1 (2008). Otherwise put, the Thelemaques claim that the defendants targeted them as unsophisticated borrowers with little understanding of the nature of the transaction or of English, whom the defendants fully expected to fall into default, in essence dooming them to foreclosure. They seek damages, rescission of the loans, and a declaration to the effect that any security interests held by Fremont’s successors in interest are void, and any debts arising from the loans are wholly unsecured.
Fremont has now moved for summary judgment on all counts of the plaintiffs’ complaint. People’s Choice has moved for partial summary judgment on Counts I, II, III, IV, V, VI, VIII and IX.
DISCUSSION
Summary judgment will be granted where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When the moving party does not bear the burden of proof at trial, as is the case here, it is entitled to summary judgment either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
While the record must be examined in the light most favorable to the non-moving party, Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005), “(cjonclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment.” Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n., 399 Mass. 886, 890 (1987). “If the opposing party fails properly to present specific facts establishing a genuine, triable issue, summary judgment should be granted.” Id.
I. Violation of G.L.c. 93A (Count I)
The statutory criteria for unfair conduct are whether it lies “within at least the penumbra of some common-law, statutory, or other established concept of unfairness; . . . whether it is immoral unethical, oppressive, or unscrupulous; [and] whether it causes substantial injury to consumers . . .” PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). The Supreme Judicial Court has determined that loans made to borrowers “on terms that showed they would be unable to pay and therefore were likely to lead to default were unsafe, unsound, and probably unfair.” Fremont, 452 Mass. at 744. Loans featuring a combination of the following four characteristics qualify as unfair under c. 93A: (1) the loans are ARM loans with an introductory rate period of three years or less; (2) they feature an introductory rate for the initial period that is at least two per cent below the fully indexed rate; (3) they are made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had [the lender] measured the borrower’s debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio is at least 97%. Commonwealth v. H&R Block, Inc., 2008 WL 5970550 (Mass.Super. 2008) (Gants, J.) [25 Mass. L. Rptr. 92] (modifying the standard articulated in Fremont).
Here, the plaintiffs have provided sufficient evidence that the loans were made on the terms described in H&R Block. The primary loan had an initial rate of 7.5% for a two-year period which changed on November 1, 2007, to a fully indexed rate of 10.125%.[21] Thus the initial, or “teaser” rate is over two percentage points lower that the fully indexed rate. In addition, using the fully indexed rate, the Thelemaques’ obligation on the primary loan is $2,748.71,[22] and on the, secondary loan is $700.52, for a total monthly payment of $3,449.29. Adding to that the insurance and tax amounts of $341 set forth in the loan application, the total amount the Thelemaques were to pay is $3,790. Their debt-to-income ratio, according to their expert, is thus 52% using the incomes stated on the loan documents.
That does not end the matter, however. The The-lemaques assert that they submitted pay stubs and W-2 forms indicating their actual income, which they claim is significantly lower than the income identified in the loan documents. Both Fremont’s Pre Doc Checklist and its Rule 30(b)(6) witness testimony might support this assertion. A reasonable jury could find that People’s Choice prepared the inflated income without the Thelemaques’ permission or knowledge, notwithstanding that the Thelemaques signed the loan application under pains and penalties of perjury. It could further find that Fremont was in possession of the wage documentation and knew or should have known of the misrepresentation. See, e.g., H&R Block, 2008 WL 5970550 [23] In that event, the Thelmaques’ *433 debt could be far greater than fifty percent of their income,[24] fully satisfying the third criteria for unfair and deceptive practices. See Fremont at 739.
With respect to the fourth factor, the loan documents on their face indicate that the loan-to-value ratio was 100%. The purchase price of the property was $400,000, the total value of both the mortgage loans. To the extent that the defendants might argue that the property was worth more, with a corresponding adjustment in the loan-to-value ratio, there is no such evidence in the record. The defendants would have the burden at trial to prove that the amount of the loan was no more than 97% of the value of the property.
Finally, there is the Thelemaques’ claim that the defendants failed to inform them of the Yield Spread Premium and its effect on their interest rate. The defendants point out that the complaint does not allege a violation of the Real Estate Settlement Procedures Act, 12 U.S.C.A. §§2601-2617 (“RESPA”), and HUD has concluded that Yield Spread Premiums are not per se a violation of the statute. That said, HUD has stated that the compensation to the broker must be for goods or facilities provided or services performed and that the total compensation paid by the borrower and lender must be reasonably related to services actually performed by the broker. 66 Fed.Reg. 53052 (Oct. 18, 2001). While the plaintiffs cannot rely on a violation of RESPA as the basis for their c. 93A claim with respect to the Yield Spread Premium, they are entitled to adduce facts at trial to support a claim that it was not reasonably related to services performed by People’s Choice and thus constituted an unfair and deceptive practice.[25]
In addition, there is evidence in the record from which a reasonable juiy could conclude that the defendants violated the Attorney General’s regulations pertaining to Mortgage Brokers and Mortgage Lenders in effect at the time of the closing. See 940 C.M.R. §8.01 et seq. Although the defendants argue that Lucien did not promise that the Thelemaques could refinance, Henry testified that Kelly told her, with Jacques present, that the Thelemaques need not worry about the interest rate as they could refinance in six months. Lucien testified that there was much discussion between Heniy and the Thelemaques in Haitian Creole during the closing. She also testified that she explained that where there was no prepayment penalty, they could refinance at any time. See 940 C.M.R. §8.06(1).[26]
It is also a question of fact whether the Thelemaques had a reasonable opportunity to review the loan documents prior to the closing. See 940 C.M.R. §806(11).[27] While the defendants maintain they mailed the documents, the Thelemaques claim they never received them. As to the Mortgage Broker Disclosures form, Ex. PP, that Margarette signed on September 29, 2005,[28] a jury could find that People’s Choice violated the regulation by failing to include relevant and available information. See 940 C.M.R. §8.05(1).[29] A jury could also conclude that the defendants’ failure to inform the Thelemaques of the Yield Spread Premium violated the applicable regulation. See 940 C.M.R. §8.06(12).[30]
The defendants’ fall back position is that the The-lemaques signed the loan documents and are thus bound by their terms, regardless of whether they read or understood them. See, e.g., Spritz v. Lishner, 355 Mass. 162, 164 (1969). The problem with this argument is that a party is not bound by the terms of a document signed in reliance upon a fraudulent misrepresentation. See, e.g., King v. Motor Mart Garage Co., 336 Mass. 422, 426 (1957). The Thelemaques argue that they relied upon the promise that they could refinance in six months. Taking the evidence in the light most favorable to the plaintiffs, the court concludes that a reasonable juiy could find that representation fraudulent and conclude that the The-lemaques relied upon it in entering into the loan transaction to their detriment. See discussion, infra.[31] See, e.g., Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235, 255 (2007). See also Lee v. Allied Sports Assocs., Inc., 349 Mass. 544, 551 (1965) (question of fraudulent misrepresentation generally a factual issue). For the above reasons, the Thelemaques’ cjaim for a violation of G.L.c. 93A survives.
II. Violation of G.L.c. 151B, §4(3B) (Count III)
The Thelemaques mistakenly argue that their claim under G.L.c. 151B, §4(3B) is not barred by their failure to file a complaint with the Massachusetts Commission Against Discrimination pursuant to G.L.c. 15IB, §§5 and 9. They quote only a portion of §9 for the proposition that a plaintiff may file a complaint directly in the Superior Court. Section 9, however, imposes a one-year statute of limitation.[32] And although §5 provides that a plaintiff “may” file a complaint with the MCAD, to allow the Thelemaques to circumvent this requirement would vitiate the purpose of the MCAD filing to provide notice to a defendant of a potential lawsuit and give him the opportunity to conciliate. See, e.g., King v. First, 46 Mass.App.Ct. 372, 375 (1999). Summary judgment shall therefore enter for the defendants on Count III.[33]
III. Civil Conspiracy (Count IV)
A claim for civil conspiracy requires evidence that the participants had a common plan to commit a tortious act. See, e.g., Stock v. Fife, 13 Mass.App.Ct. 75, 83 n.10 (1982). “Key to this cause of action is a defendant’s substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan.” Kurker v. Hill 44 Mass.App.Ct. 184, 189 (1998). See also Aetna Cas. Ins. Co. v. P&B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994) (plaintiff must allege “first a common design or agreement, although not necessarily express, between two or more *434 persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement”).
The defendants cite Massachusetts Sch. of Law v. American Bar Ass'n., 1997 WL 136240 at *7 (D.Mass 1997), for the proposition that mere contact and communication between professional organizations is not sufficient to establish an unlawful conspiracy. Here, however, the plaintiffs have submitted evidence from which ajury could conclude that Fremont and People’s Choice acted in concert to, at the very least, artificially inflate the Thelemaques’ income in order to realize a debt-to-income ratio that was under 50%.[34] See discussion, supra. In addition, the payment of a Yield Spread Premium raises questions of fact with respect to whether Fremont and People’s Choice participated in a common plan to increase the interest rate in order to increase the premium. See, e.g., In re Noyes, 382 B.R. 561, 577 (D.Mass. 2008). The evidence is, at best, a toehold to establish pecuniary loss, but a toehold is sufficient to survive a motion for summary judgment. Marr Equipment Corp. v. I.T.O. Corp., 14 Mass.App.Ct. 231, 235 (1982).[35]
IV.Fraud and Negligent Misrepresentation (Counts V and VI)
In order to recover for fraudulent and negligent misrepresentation the Thelemaques “must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [her] damage.” Massengill v. EMC Corp., 449 Mass 532, 540 (2007). See also Gossels v. Fleet Natl. Bank, 453 Mass. 366, 371-72 (2009).
The defendants argue that because the loan documents were signed on October 21, 2005, the statute of limitations bars the Thelemaques’ tort claims. This argument is without merit. The limitations period begins “when a reasonably prudent person (in the tort claimant’s position) . . . should have discovered that he had been harmed by the defendant.” Hanson Housing Auth. v. Dryvit Sys., Inc., 29 Mass.App.Ct. 440, 446 (1990). “Certain causes of action based on inherently unknowable wrongs do not accrue until the plaintiffis] leam[ ] . . . that [they] have been harmed by the defendant’s conduct.” Id. at 443. To the extent that the Thelemaques’ claims are based on any promise to refinance,[36] a jury could conclude that they could not have known that they had been harmed until People’s Choice refused their request to refinance in April 2006. This action was filed on November 21, 2008, well within the statute of limitations.
That said, to the extent that the Thelemaques argue fraudulent and negligent misrepresentations with respect to the content of the loan documents, that argument must fail. They claim that they did not receive the documents prior to closing, did not read them at the closing and did not understand Lucien’s explanations. They cannot then argue that they relied on something they did not receive, did not read, and did not understand. For that reason, Counts V and VI will stand for trial, limited to the issue of whether the defendants fraudulently or negligently misrepresented that the Thelemaques could refinance in six months.
V.Unconscionability (Count VII)[37]
The doctrine of unconscionability recognizes both procedural and substantive unconscionability. Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 292-93 (1980). It must be decided on a case by case basis, “giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party.” Id. at 293.[38]
Here, the closing was conducted by an attorney acting on behalf of the defendants, and in a language the Thelemaques, who were not represented by counsel, either did not understand or understood poorly. They were unsophisticated borrowers who had never purchased property before. There was no allocation of risk based on superior bargaining power. See Waters v. Min. Ltd., 412 Mass. 64, 68 (1992). Compare In Re Sullivan, 346 B.R. 4, 29-30 (D.Mass. 2006). The The-lemaques assumed all the risk, the defendants, who assigned the first mortgage to U.S. Bank effective February 29, 2008, assumed virtually none. See Fremont, 452 Mass. at 736 (after funding a loan, Fremont typically sold it on the secondary market, largely insulating it from losses arising from borrower default). As to substantive unconscionability, once the interest rate increased, their payments consumed over 80% of their income, often called “payment shock.” Fremont 452 Mass. at 740 n.14. A reasonable jury could conclude that in the circumstances of this case, the Thelemaques were unfairly surprised by the terms of the loan such that it was procedurally and substantively unconscionable.
VI.Breach of the Covenant of Good Faith and Fair Dealing (Count IX)
There is an implied covenant in every contract that “neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991). Although the Thelemaques make no argument in their memorandum of law with respect to this claim against Fremont, the complaint suggests that they claim that the defendants fraudulently induced the plaintiffs to enter into a contract. The implied covenant, however, governs the performance of the contract, not its formation. 2See Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass 376, 385 (2004). Summary judgment will therefore enter for Fremont on Count IX.
As to People’s Choice, the Thelemaques argue that it failed to perform the services outlined in the Contract for Services, in violation of the covenant. Ex. 27. While the question is a close one, the court concludes *435 that, at least with respect to Peoples’ Choice’s contract to “conduct preliminary underwriting review of loan application file,” a jury could find that it failed to adequately review or verify the Thelemaques’ income. Count IX against People’s Choice will therefore stand for trial.
VII. Violation of the Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA) (Count X)
The plaintiffs make no argument on their claim for a violation of the MCCCDA; the court declines to supply one and considers it waived. Therefore, for the reasons set forth in Fremont’s Memorandum of Law, at pp. 27-28, summary judgment shall enter for Fremont on Count X.
ORDER
For the forgoing reasons, the Motion of Defendant, Signature Group Holdings, Inc., Successor in Interest to Fremont Reorganizing Corporation f/k/a/ Fremont Investment & Loan, for Summary Judgment on All Counts of Plaintiffs’ Complaint (Paper #57) is DENIED as to Counts I, IV and VII, and ALLOWED as to Counts III, IX and X. Defendant People’s Choice Mortgage, Inc.’s Motion for Partial Summary Judgment on Counts I, II, III, IV, V, VI, VIII and IX of the Plaintiffs’ Complaint (Paper #63) is DENIED as to Counts I, IV and IX, and ALLOWED as to Count III. As to Counts V and VI, both Defendant’s motions are ALLOWED to the extent that those counts are based on the contents of the loan documents, and DENIED as to the issue of refinancing.

defendant Wells Fargo Bank, N.A., is the servicer of the Thelemaque’s first mortgage loan and for all the loans in the MASTR Asset Backed Securities Trust 2006-FREI, the holder of the Thelemaque’s first mortgage loan. Defendant U.S. Bank is the trustee for holder MASTR Asset Backed Securities Trust 2006-FREI. At the time the complaint was filed, U.S. Bank had commenced foreclosure proceedings against the The-lemaques, with a foreclosure auction scheduled for December 2,2008. Defendant Wells Fargo reportedly exercised decision-making authority over the foreclosure. Defendant Ocwen Loan Servicing, LLC, is the servicer of the Thelemaque’s second mortgage. Defendant MTGLQ Investors, L.P. is the assignee holder of the Thelemaque’s second mortgage loan.

The court notes at the outset that, as is unfortunately so often the case, the parties’ submissions pursuant to Superior Court Rule 9A(b)(5) fail miserably to adhere to the stringent requirements of that Rule. The fault is widespread. All parties’ statements and responses to opposing parties’ statements are replete with legal argument, conclusions, descriptions of and quotations from documents, and repetition of deposition testimony. Legal arguments and conclusion belong in the memorandum of law, not in the Rule 9A(b)(5) statement. As to quotations from documents and deposition testimony, not only is this exercise fruitless, it improperly takes quotations out of context. The parties are ordered to read and take to heart Judge Judith Fabricant’s recent posting on the Boston Bar Association website, entitled “Just the Facts.” The court reminds the parties that failure to comply with the Rule has potentially serious consequences. See, e.g., Dziamba v. Warner & Stackpole, 56 Mass.App.Ct. 397, 399-401 (2002).

For the sake of simplicity, the court will refer to Ms. Thelemaque as “Margarette” and Mr. Thelemaque as “Jacques.”

fyhe defendants claim that, with tips, her actual income was higher. Margarette testified that tips were uncertain and that the amount varied.

Peggy Cansdale, Fremont’s Rule 30(b)(6) witness, testified that the Pre-Doc Account Manager’s Checklist would be filled out by the account manager for the Thelemaques’ loan.

Cansdale testified that, although the Pre Qual was for a stated income loan, the interest rates written in matched a “full doc. loan ... I think they were looking at several products ... I am seeing mixed information.”

Both Margarette and Henry testified that Henry took documents to the Sheraton for Margarette to sign during her break. It is not clear whether the Borrower’s Certificate and the Good Faith Estimate were among those documents.

The mortgage therefore has a 100% loan to value ratio— that is the relationship of the amount of that loan to the value of the property. Because there is no difference, any equity in the property would exist only if the value of the property increased.

A Stated Income Loan involves only a verification that the borrower is employed. In a Full Document Loan, by contrast, the actual income of the borrower, as reflected in pay stubs and W-2 forms, is used to determine the borrower’s ability to repay the mortgage. It is undisputed that the base rate for a full document loan was 5.85% as compared to 6.6% for a stated income loan. Cansdale testified that the information on the Pre Qual indicated that the broker was “looking at the interest rates to determine a full doc.; however the income says stated.” Ex. EE, Cansdale Depo. at 166-67.

The monthly payment for the secondary loan was fixed at $700.58. Although many of the terms of this loan are similar to those with respect to the primary loan, the court will address only the primary loan, unless otherwise noted.

The loan was to be amortized over forty years, but was due in thirty years.

The Thelemaque’s monthly payments for both loans was thus over $2,800.

Thomas A. Tarter, the plaintiffs’ expert, stated in his affidavit that the fully indexed rate at the time of the loan was 4.37125% (the LIBOR) plus the adjustment margin of 5.7431% which, when rounded, equals 10.125%.

Although the loan provided for a fixed interest rate for the first two years, it adjusted every six months to a considerably higher variable rate for the remaining period of the loan. Thus while the Thelemaques’ monthly payments started out lower, they increased substantially after the introductory two-year period. See, e.g., Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 737 (2008).

This is the amount set forth in the Truth-In-Lending Disclosure Statement. The Pre-Disclosure lists the balloon payment as $207,374.47 and in their 9A(b)(5) statement, the plaintiffs list it as $208,654.18.

A Yield Spread Premium is a payment made by the lending institution to the mortgage broker based on the rate of interest charged on the borrower’s loan. The higher the interest rate, the larger the Yield Spread Premium. See Howard E. Jackson & Laurie Burlingame, Kickbacks or Compensation: The Case of Yield Spread Premiums, 12 Stan. J.L. Bus. & Fin. 289, 289 (2007). See also Fremont, 452 Mass. at 736, n.8.

Total closing costs, according to the Thelemaques’ c. 93A demand letter, were $8,526.58.

The dates of Jacques’ request to refinance are not clear. He testified that he called Kelly some six months after the closing, thus in 2006. People’s Choice stated that Jacques called another broker in 2008.

The plaintiffs claim that they sent a c. 93A demand letter to all the defendants on October 6, 2008, and cite to Exhibit *436 ZZ of the appendix. Exhibit ZZ contains the demand letter, but not, as the plaintiffs claim, Fremont’s acknowledged receipt of the letter “on a U.S. post office-provided receipt form.” This is not surprising. When a party chooses to submit to the court an unbound appendix of over 60 unstapled exhibits, it runs the quite foreseeable risk that one or more of the more than 100 loose pages will be lost or misplaced in transit, assuming that it once existed. Furthermore, should the court, on a warm spring day, decide to open the window, what at first blush might seem a refreshing breeze instantly becomes a destructive force, scattering pages hither and yon.

The complaint asserts claims for violation of G.L.c. 93A, §9 (Count I); Violation of G.L.c. 183(c) (Count II); discrimination in violation of G.L.c. 151B, §4(3B) (Count III); civil conspiracy (Count IV); fraud (Count V); negligent misrepresentation (Count VI); unconscionabilily (Count VII); intentional infliction of emotional distress (Count VIII); breach of the covenant of good faith and fair dealing (Count IX); and violation of the Massachusetts Consumer Credit Cost Disclosure Act (Count X). The plaintiffs have since withdrawn Counts II and VIII.

See n.13, supra,

See Affidavit of Thomas A. Tarter at 44. The Truth-In-Lending Disclosure Statement sets the monthly payment as $2,735.88. The difference is not material however, to the court’s conclusion.

A jury could also find that the broker acted in complicity with the Thelemaques in misrepresenting their income to qualify for the loan.

Their expert puts the debt-to-income ration using their actual incomes as 82%.

See Howard E. Jackson & Laurie Burlingame, Kickbacks or Compensation: The Case of Yield Spread Premiums, 12 Stan. J.L. Bus. &Fin. 289, 312 (2007) (“For current purposes, it is sufficient to note that the relationship between a consumer and a mortgage broker who selects a mortgage lender and receives a yield spread premium in return has all the hallmarks of a potentially abusive trilateral dilemma. The mortgage broker occupies a position of trust and confidence and plays a major, often exclusive role in selecting the consumer’s loans. Under current disclosure rules, the mortgage broker’s compensation, including its receipt of a yield spread premium, is difficult for the borrower to monitor, particularly as the market price of mortgage broker compensation is not well-defined and brokers may engage in a substantial amount of price discrimination at the expense of unwary consumers. Finally, the mortgage broker’s compensation is extracted in the midst of a larger, complex transaction and the borrower’s attention is likely to be focused on other matters. Under these conditions, market forces are unlikely to protect consumers from abusive practices and excessive charges").

 940 C.M.R. §8.06(1) provides: “It is an unfair or deceptive act or practice for a mortgage broker or lender to make any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading, or if the mortgage broker or lender does not have sufficient information upon which a reasonable belief in the truth of the representation or statement could be based. Such claims or representations include, but are not limited to the availability, terms, conditions, or charges, incident to the mortgage transaction and the possibility of refinancing. In addition, other such claims and representations by the broker may include the amount of the brokerage fee, the services which will be provided or performed for the brokerage fee, the borrower’s right to cancel any agreement with the mortgage broker, the borrower’s right to a refund of the brokerage fee, and the identity of the mortgage lender that will provide the mortgage loan or commitment.”

 940 C.M.R. §8.06(11) provides: “It is an unfair or deceptive act or practice for a mortgage broker or lender to fail to give to the borrower or his or her attorney the time and reasonable opportunity to review every document signed by the borrower and every document which is required pursuant to these regulations, and other applicable laws, rules or regulations, prior to the disbursement of the mortgage funds.”

The form lists a different borrower, Steven Happas, a different property, and a different loan amount.

 940 C.M.R. §8.05(1) reads: “It is an unfair or deceptive act or practice for a mortgage broker to fail to provide the following Attorney General’s Mortgage Broker Disclosure Form (the “Form”). This Form shall be completed with as much information as is available at the time the Form must be provided pursuant to 940 CMR 8.05(5), on a separate document, in at least 12 point type or 10 pitch courier. The broker may delete such provisions which do not apply to a particular loan transaction."

 940 C.M.R. §8.06(12) reads: “It is an unfair or deceptive act or practice for a mortgage broker or lender to accept any fees which were not disclosed in accordance with these regulations or applicable law.”

 To the extent that the defendants argue any promise to refinance was merely an opinion and thus not actionable, an opinion becomes actionable where the parties to the transaction do not stand on equal footing and where one party has superior knowledge of the subject of the alleged misrepresentation. Gopen v. American Supply Co., 10 Mass.App.Ct. 342, 345 (1980), McEaney v. Chestnut Hill Realty Corp., 38 Mass.App.Ct. 573, 575 (1995).

 Section 9 reads in its entirety: “Any person claiming to be aggrieved by an unlawful practice relative to housing under this chapter, but who has not filed a complaint pursuant to section five, may commence a civil action in the superior or probate court for the county in which the alleged unlawful practice occurred or in the housing court within whose district the alleged unlawful practice occurred; provided, however, that such action shall not be commenced later than one year after the alleged unlawful practice has occurred.”

 The plaintiffs argue that People’s Choice may not now assert a statute of limitations affirmative defense where it did not do so in its answer. People’s Choice argues that, because Fremont asserted that defense, thus putting the plaintiffs on notice. There is sufficient evidence, People’s Choice argues, for the court to grant it leave to amend. No such motion appears on the docket.

Although the Thelemaques’ expert puts their debt-to-income ratio, using the incomes stated on the loan documents, as 52%, he factored in taxes and insurance.

To the extent that People’s Choice argues that the statute of limitations bars this claim, see discussion, infra.

The court notes that well before the closing, Kelly purportedly told Henry, with Jacques present, that People’s Choice would refinance in six months. Therefore the defendants’ argument that in entering into the loan transaction, the Thelemaques could not rely on Lucien’s statement after the closing is of no merit. The Thelemaques could well have relied upon Kelly’s misrepresentation.

People’s Choice has not moved for summary judgment on Count VII, contending that it is not directed at People’s Choice. The plaintiffs respond to the contrary.

That the defendants’ conduct constituted unfair or deceptive practices does not, by itself, mean that it was unconscionable. See, e.g., In Re Maxwell 281 B.R. 101, 129 (D.Mass. 2002).